Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/21/2016 09:08 AM CDT

Clarence W. Devney, appellee, v.
Elizabeth A. Devney, appellant.
___ N.W.2d ___

Filed October 21, 2016.    No. S-15-937.

1. **Statutes: Appeal and Error.** To the extent an appeal calls for statutory interpretation or presents questions of law, an appellate court must reach an independent conclusion irrespective of the determination made by the court below.

2. **Divorce: Appeal and Error.** In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. This standard of review applies to the trial court's determinations regarding division of property.

3. **Judges: Words and Phrases.** A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

4. **Statutes.** Statutes which effect a change in the common law are to be strictly construed.

5. **Contracts: Marriage.** All postnuptial agreements were void at common law.

6. **Estates: Divorce: Property Settlement Agreements: Waiver.** The language of Neb. Rev. Stat. § 30-2316(d) (Reissue 2008) contemplates the waiving of the spouse's rights of inheritance only. It makes no reference to agreements allocating property rights upon separation or divorce.

7. **Divorce: Property Settlement Agreements.** An agreement between a husband and wife concerning the disposition of their property, not made in connection with the separation of the parties or the dissolution of their marriage, is not binding upon the courts during a later dissolution proceeding under Neb. Rev. Stat. § 42-366 (Reissue 2008).

8. **Marriage: Property Settlement Agreements: Public Policy.** Postnuptial property agreements are against the public policy of Nebraska because of the deleterious effect such agreements have on marriages.

9. **Marriage: Property Settlement Agreements: Statutes.** Nebraska has no statutory authority supporting property agreements postnuptially.

10. **Marriage: Property Settlement Agreements: Public Policy.** Post-nuptial property agreements are void as statutorily unauthorized, and such agreements both were prohibited under common law and violate the public policy of Nebraska.

11. **Contracts: Public Policy.** Any contract which is clearly contrary to public policy is void.

12. **Courts: Divorce: Property Settlement Agreements: Appeal and Error.** A district court abuses its discretion by relying exclusively on void portions of an agreement to make property distributions in a dissolution proceeding, such reliance being clearly untenable.

Appeal from the District Court for Saunders County: Mary C. Gilbride, Judge. Vacated in part, and in part reversed and remanded with direction.

Michael B. Lustgarten, of Lustgarten & Roberts, P.C., L.L.O., for appellant.

Frederick D. Stehlik and Zachary W. Lutz-Priefert, of Gross & Welch, P.C., L.L.O., for appellee.

Heavican, C.J., Wright, Miller-Lerman, Cassel, Stacy, Kelch, and Funke, JJ.

Funke, J.

## NATURE OF CASE

This matter commenced as a petition for dissolution of marriage between Clarence W. Devney and Elizabeth A. Devney. The district court dissolved the marriage between the parties and divided the parties' assets and debts. In doing so, the district court found that a postnuptial property agreement entered into by the parties was valid and enforceable and that the division of the marital estate was fair and reasonable. Elizabeth appeals from both of these findings.

The main issue presented is whether a property agreement in a postnuptial agreement that was not attendant upon the spouses' separation or divorce is valid in Nebraska.

We conclude that such property agreements remain void in Nebraska. Accordingly, the district court erred in enforcing the property agreement provision of the parties' postnuptial agreement. For the reasons set forth herein, we reverse in part, and vacate in part, the judgment of the trial court and remand the cause with direction.

## BACKGROUND

Clarence and Elizabeth were married in August 1998. No children were born of their marriage, but each party had children from previous marriages, all of whom have reached the age of majority. Clarence commenced a marital dissolution proceeding in April 2014. After a trial, the court issued its decree in September 2015.

At trial, Clarence sought to enforce the parties' postnuptial agreement. Clarence and Elizabeth executed the postnuptial agreement in January 1999, 5 months after their marriage. The parties had discussed a prenuptial agreement with Clarence's attorney to protect the interests of their children from previous marriages but failed to execute one before the marriage. Instead, the parties included a clause in the postnuptial agreement stating that the agreement was effective as of August 1998 and enforceable as if it were a prenuptial agreement.

The parties created the postnuptial agreement to address "the disposition of their respective assets upon the death of either party or in the event that the parties should terminate their marriage." In the event of Clarence's death, Elizabeth waived her statutory rights in his estate, such as homestead allowances, exempt property, family allowances, and the right of election of her statutory share of Clarence's augmented estate; but she was entitled to receive the marital residence and the residuary of Clarence's estate, excluding specific legacies in his will. In the event of Elizabeth's death, Clarence waived his statutory rights in her estate as well, but was entitled to receive the residuary of her estate, excluding specific legacies in her will.

If the marriage were dissolved, each party waived and relinquished all interest in the other spouse's premarital property, identified in exhibits A and B of the postnuptial agreement. Elizabeth was entitled to 50 percent of the assets acquired by the parties after the marriage. Exhibits A and B were purported to be lists of the parties' premarital assets and debts and the values of the same.

Clarence's attorney, Ronald L. Eggers, drafted the postnuptial agreement and represented him through the execution. Elizabeth was not represented by an attorney. Eggers testified that he would have clearly explained the agreement's "Representation by Counsel" section to Elizabeth, informing her that he did not represent her and that she was free to obtain her own counsel.

Clarence purchased the marital residence 7 years before the parties married, for $130,000. Prior to the marriage, few improvements were made to the marital residence, and the residence had an assessed tax value of just over $103,000. Elizabeth moved into the marital residence after the parties married. During the marriage, the parties made substantial improvements throughout the residence. At trial, Clarence estimated the home to be worth about $310,000; Elizabeth had the home appraised at $330,000. When the parties married, the debt against the marital residence was $90,000; it had been reduced to $18,000 by the time of trial.

Exhibit A of the postnuptial agreement listed the premarital value of the marital residence as $250,000. Clarence signed a deed transferring the marital residence into both parties' names after the postnuptial agreement was executed, under the belief it was required by the agreement. The language of the agreement stated, "The transfer of title of any asset by Clarence to [the parties] shall not affect the terms and provisions of this Agreement, notwithstanding the creation of a joint tenancy or other relationship by such transfer."

The parties' trial testimony is in contradiction on four factual circumstances regarding the execution of the postnuptial

agreement. Eggers also testified about the circumstances surrounding the execution of the postnuptial agreement, but he lacked a strong recollection of the events and testified mostly from the exhibits he provided.

First, Clarence stated the parties decided that $250,000 was a fair assessment of the marital residence's value at the time of their marriage, after taking the county assessment into consideration. However, Elizabeth denied being involved in any of the valuations in exhibit A or B. Eggers stated he would not have prepared exhibit B, the valuation of Elizabeth's separate property, without consulting Elizabeth.

Second, Clarence testified that Eggers went over the postnuptial agreement "word for word" with Elizabeth the day it was signed, but Eggers could confirm only that he discussed the agreement with Elizabeth in May 1998 for "8/10ths of an hour." He could not confirm that he explained it to her in January 1999 or that she ever saw the final postnuptial agreement. Elizabeth stated that she was presented with only the signature page and never saw the contents of the postnuptial agreement or the exhibits, but that she signed the agreement pursuant to Clarence's demand.

Third, Clarence stated that the parties signed the postnuptial agreement in Eggers' office, but Elizabeth testified that she signed it at her kitchen table without the presence of a notary public. Eggers believed that he did not travel out of his office for the signing because he billed only 0.3 hours on that date and that he would have billed more time if travel had been involved. Eggers identified the notary public as a deceased former secretary at his law firm. Eggers stated that he would have never asked a secretary to notarize a document unless she had seen the document and witnessed its execution.

Fourth, Clarence testified that the parties also executed wills, essentially mirroring the terms of the postnuptial agreement, on the same day the parties signed the agreement. Elizabeth confirmed her signature on her will, but she stated that she would not have consented to its terms and could not recall ever

having read it or recall the circumstances behind her signing it. Eggers testified that he represented Elizabeth in executing her will and that he would not have prepared it without Elizabeth's direction on the contents. Elizabeth's will does not contain a valuation of the marital residence or any of the other items present in the exhibits.

The trial court determined that the postnuptial agreement should be enforced as written. Accordingly, the court concluded that $250,000, the agreed-upon premarital value of the marital residence, should be set off from the marital estate for Clarence. Additionally, the court found that the marital residence increased in value by $80,000 during the marriage, and the court equally divided the increase because it had resulted from the parties' joint efforts and expenditures on the property after the postnuptial agreement was signed. The district court then ordered the division of other assets and ordered Clarence to pay Elizabeth an equalization payment of $116,747 within 90 days from the date of the decree.

## ASSIGNMENTS OF ERROR

Elizabeth assigns that the district court erred as follows:

(1) in not finding the postnuptial agreement void and unenforceable;

(2) in determining that the value of the marital residence was $250,000 at the time of the marriage; and

(3) in finding that Clarence was entitled to a setoff, as a nonmarital asset, of the first $250,000 in equity in the marital residence.

## STANDARD OF REVIEW

[1] To the extent an appeal calls for statutory interpretation or presents questions of law, an appellate court must reach an independent conclusion irrespective of the determination made by the court below.[1]

---

[1] *SID No. 1 v. Adamy*, 289 Neb. 913, 858 N.W.2d 168 (2015).

[2,3] In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge.[2] This standard of review applies to the trial court's determinations regarding division of property.[3] A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[4]

## ANALYSIS

### Property Agreements in Postnuptial Agreements Are Void

Elizabeth contends that postnuptial property agreements are neither permitted by statute nor Nebraska's public policy. Historically, this court has held that postnuptial property agreements were invalid because of a common-law prohibition and on the grounds of public policy.[5]

In contrast, we have long accepted postnuptial separation agreements to divide the parties' property. In 1921, this court described a separation agreement as one

>  where husband and wife find it impossible to dwell together in harmony, because of the misconduct of one which would warrant a legal separation, decide to enter into a contract adjusting all the property rights, and each

---

[2] *Sellers v. Sellers*, 294 Neb. 346, 882 N.W.2d 705 (2016); *Coufal v. Coufal*, 291 Neb. 378, 866 N.W.2d 74 (2015).

[3] See *Sellers, supra* note 2.

[4] *Stanosheck v. Jeanette*, 294 Neb. 138, 881 N.W.2d 599 (2016).

[5] *Chambers v. Chambers*, 155 Neb. 160, 51 N.W.2d 310 (1952); *Focht v. Wakefield*, 145 Neb. 568, 17 N.W.2d 627 (1945); *Smith v. Johnson*, 144 Neb. 769, 14 N.W.2d 424 (1944).

relinquish any rights in the property of the other, and provid[e] for the immediate separation of the parties.[6] In *In re Estate of Lauderback*,[7] we held that such agreements are valid and enforceable. In *Smith v. Johnson*,[8] we affirmed that holding: "Separation agreements founded on this broad, equitable doctrine do not contravene public policy."

However, *Smith* also clarified that *In re Estate of Lauderback* did not recognize the right of husband and wife to "enter into a postnuptial agreement barring their respective rights in the other's real property while the complete marriage relation exists."[9] We held that such contracts are void under common law and that the Legislature had not abrogated that rule.[10]

In *Focht v. Wakefield*,[11] we reiterated the holding of *Smith*: "'Postnuptial contracts entered into between husband and wife while residents of [Nebraska] in which they settle their property rights, including their respective rights of inheritance in the property of the other, are not authorized by express statute and are invalid and unenforceable.'" We reasoned that inheritance rights are controlled by statute and that the Legislature had authorized prenuptial agreements only as a vehicle to waive a right to inherit from his or her spouse's estate.[12] We interpreted this specific authorization to preclude such agreements postnuptially.[13]

---

[6] *In re Estate of Lauderback*, 106 Neb. 461, 465, 184 N.W. 128, 130 (1921). Accord, *Smith, supra* note 5 (distinguishing cases that are commonly called separation agreement cases); *Ladman v. Ladman*, 130 Neb. 913, 267 N.W. 188 (1936).

[7] *In re Estate of Lauderback, supra* note 6.

[8] *Smith, supra* note 5, 144 Neb. at 772, 14 N.W.2d at 425.

[9] *Id.* at 771, 14 N.W.2d at 425.

[10] *Id.*

[11] *Focht, supra* note 5, 145 Neb. at 573, 17 N.W.2d at 630. See, also, Neb. Rev. Stat. § 30-106 (1943).

[12] *Focht, supra* note 5.

[13] *Id.*

Clarence relies heavily upon the Nebraska Court of Appeals' decision *In re Estate of Kopecky*,[14] where the court held that by amending § 30-106—permitting spouses to also waive inheritance rights in their spouses' estate postnuptially—the Legislature authorized all postnuptial agreements. The *In re Estate of Kopecky* court concluded that the amendment of § 30-106 nullified the holdings of this court in *Chambers v. Chambers*[15] and *Focht* and *Smith*, all of which had held post-nuptial agreements void against public policy.

At the time the agreement at issue in *In re Estate of Kopecky* was executed, § 30-106 (Cum. Supp. 1969) was in effect and provided:

> A man or woman may also bar his or her right to inherit part or all of the lands of his or her husband or wife by a contract made in lieu thereof before marriage or after a second or subsequent marriage where one or both of the parties have children of a previous marriage, or where either spouse has been married previously and the other spouse has not been previously married. Such contract shall be in writing signed by both of the parties to such marriage and acknowledged in the manner required by law for the conveyance of real estate, or executed in conformity with the laws of the place where made.

In 1974, the Legislature simultaneously repealed § 30-106 and adopted the Uniform Probate Code, including Neb. Rev. Stat. § 30-2316 (Cum. Supp. 1974).[16] Section 30-2316 (Reissue 2008) currently states:

> (a) The right of election of a surviving spouse and the rights of the surviving spouse to homestead allowance, exempt property, and family allowance, or any of them, may be waived, wholly or partially, before or after

---

[14] *In re Estate of Kopecky*, 6 Neb. App. 500, 574 N.W.2d 549 (1998).

[15] *Chambers, supra* note 5.

[16] See 1974 Neb. Laws, L.B. 354, § 38.

marriage, by a written contract, agreement, or waiver signed by the surviving spouse.

. . . .

(d) Unless it provides to the contrary, a waiver of "all rights", or equivalent language, in the property or estate of a present or prospective spouse or a complete property settlement entered into after or in anticipation of separation, divorce, or annulment is a waiver of all rights to elective share, homestead allowance, exempt property, and family allowance by each spouse in the property of the other and a renunciation by each of all benefits that would otherwise pass to him or her from the other by intestate succession or by virtue of any will executed before the waiver or property settlement.

While the amendment to § 30-106, and the subsequently adopted § 30-2316, overruled the language of *Focht* interpreting previous statutes to prohibit postnuptial estate agreements, the holdings of *Chambers*, *Focht*, and *Smith* were much broader than the issue of estate agreements in postnuptial agreements.[17] Furthermore, in *In re Estate of Kopecky*, the Court of Appeals was concerned only with determining the applicability of an estate agreement.[18] Accordingly, any statements in *In re Estate of Kopecky* that could be interpreted as broadly upholding postnuptial property agreements are not applicable here.

[4,5] We have consistently held that statutes which effect a change in the common law are to be strictly construed.[19] We have also held that all postnuptial agreements were void at common law.[20] So to determine if postnuptial property agreements are statutorily permitted or the public policy against

---

[17] See cases cited *supra* note 5.

[18] *In re Estate of Kopecky, supra* note 14.

[19] *Alisha C. v. Jeremy C.*, 283 Neb. 340, 808 N.W.2d 875 (2012). See, also, *Blaser v. County of Madison*, 285 Neb. 290, 826 N.W.2d 554 (2013).

[20] *Smith, supra* note 5.

such agreements has been superseded by statute, we look to the statutes permitting other types of nuptial property agreements. We conclude that Nebraska statutes do not authorize postnuptial agreements to allocate the parties' property rights upon separation or divorce unless such agreements are concurrent with a separation or divorce.

[6] First, the language of § 30-2316(d) contemplates the waiving of a spouse's rights of inheritance only. It makes no reference to agreements allocating property rights upon separation or divorce.

Second, the Legislature statutorily approved of premarital agreements through the adoption of the Uniform Premarital Agreement Act,[21] which defines a "premarital agreement" as an agreement between prospective spouses made in contemplation of marriage and to be effective upon marriage.[22] The act further sets forth authorized content of a premarital agreement and the enforcement standards for such agreements.[23] We find it informative that our Legislature has not adopted the Uniform Premarital and Marital Agreements Act,[24] created in 2012, which authorizes property agreements when separation or divorce is not imminent. The Legislature has enacted each of the previous uniform acts on the subject of prenuptial and postnuptial agreements but has not yet seen fit to adopt the Uniform Premarital and Marital Agreements Act.

Third, in 1972, the Legislature adopted the Uniform Marriage and Divorce Act's provision permitting separation agreements.[25] The language of § 42-366 essentially incorporates

---

[21] Neb. Rev. Stat. §§ 42-1001 through 42-1011 (Reissue 2008). See Unif. Premarital Agreement Act, 9C U.L.A. 39 (2001).

[22] § 42-1002(1).

[23] §§ 42-1004 and 42-1006.

[24] Unif. Premarital & Marital Agreements Act, 9C U.L.A. 13 (Supp. 2016).

[25] Neb. Rev. Stat. § 42-366 (Reissue 2008). See Unif. Marriage & Divorce Act § 306, 9A (part II) U.L.A. 11 (1998).

the definition of a separation agreement in *Smith*[26] and our earlier cases:

> (1) To promote the amicable settlement of disputes between the parties to a marriage *attendant* upon their separation or the dissolution of their marriage, the parties may enter into a written property settlement agreement containing provisions for the maintenance of either of them, the disposition of any property owned by either of them, and the support and custody of minor children.
>
> (2) In a proceeding for dissolution of marriage or for legal separation, the terms of the agreement, except terms providing for the support and custody of minor children, shall be binding upon the court unless it finds, after considering the economic circumstances of the parties and any other relevant evidence produced by the parties, on their own motion or on request of the court, that the agreement is unconscionable.

(Emphasis supplied.) However, § 42-366 makes no references to using postnuptial agreements to promote amicable settlements when separation or divorce is not imminent, as is the case currently before us.

[7,8] In *Snyder v. Snyder*,[27] we considered an agreement between a husband and wife concerning the disposition of their property, not made in connection with the separation of the parties or the dissolution of their marriage. We reiterated our earlier holding from *Smith* that such property agreements "are not binding upon the courts during a later dissolution proceeding, as not being within the intendment of section 42-366."[28] Additionally, we affirmed Nebraska's public policy against postnuptial property agreements because of the deleterious effect such agreements have on marriages.[29]

---

[26] *Smith, supra* note 5.

[27] *Snyder v. Snyder*, 196 Neb. 383, 243 N.W.2d 159 (1976).

[28] *Id.* at 387, 243 N.W.2d at 161.

[29] *Id.*

[9-11] Therefore, we find no statutory support for upholding postnuptial property agreements. We find it outside the province of this court to read into Nebraska's current statutory authority the effectiveness of postnuptial property agreements when such agreements both were prohibited under common law and violate the public policy of Nebraska. Accordingly, the parties' property agreement in their postnuptial agreement is void.[30]

We recognize that in 1999, when the postnuptial agreement in this case was created, the majority of states had abandoned the public policy prohibition against postnuptial property agreements.[31] However, about half of those states had done so through legislative action.[32] Based on our decision in *Snyder*[33] and our Legislature's acquiescence to that decision, we decide that Nebraska's public policy against postnuptial property agreements has not been abrogated by statute.

Here, the postnuptial agreement was entered into 5 months after the parties married. There is nothing in the record to indicate that when the parties executed the agreement they

---

[30] *Johnson v. Nelson*, 290 Neb. 703, 711, 861 N.W.2d 705, 712 (2015) (any "contract which is clearly contrary to public policy is void").

[31] See, e.g., *Tibbs v. Anderson*, 580 So. 2d 1337 (Ala. 1991); *Casto v. Casto*, 508 So. 2d 330 (Fla. 1987); *Matter of Estate of Gab*, 364 N.W.2d 924 (S.D. 1985); *Sanders v. Colwell*, 248 Ga. 376, 283 S.E.2d 461 (1981); *In re Estate of Harber*, 104 Ariz. 79, 449 P.2d 7 (1969); *Sims v. Roberts*, 188 Ark. 1030, 68 S.W.2d 1001 (1934); *D'Aston v. D'Aston*, 808 P.2d 111 (Utah App. 1990); *Lurie v. Lurie*, 246 Pa. Super. 307, 370 A.2d 739 (1976).

[32] See, e.g., Del. Code Ann. tit. 13, § 1513 (2009); 750 Ill. Comp. Stat. Ann. 5/503 (LexisNexis Cum. Supp. 2009); La. Civ. Code Ann. art. 2331 (West 2009); Minn. Stat. § 519.11 (2014); N.M. Stat. Ann. §§ 40-2-4 and 40-2-8 (2006); N.C. Gen. Stat. § 50-20 (2007); Tex. Fam. Code Ann. § 4.102 (West 2006); Va. Code Ann. § 20-155 (2008); Wis. Stat. Ann. § 766.58 (West 2009); *Epp v. Epp*, 80 Haw. 79, 905 P.2d 54 (Haw. App. 1995) (interpreting Haw. Rev. Stat. § 580-47 (West 1993)).

[33] *Snyder, supra* note 26.

were contemplating separation or divorce or that either was imminent. Therefore, the district court erred in finding that those portions of the agreement settling the parties' property rights upon divorce but not attendant upon an immediate separation or divorce were void and unenforceable.

### DISTRICT COURT ERRED IN
### DETERMINING PREMARITAL
### VALUE AND SETOFF AMOUNT
### OF MARITAL RESIDENCE

[12] Our holding that the postnuptial property agreement was void to the extent it settled the parties' property rights upon unanticipated separation or divorce means that the agreement's valuation of Clarence's premarital interest in the marital residence is void accordingly. The trial court's valuation of the marital residence, at $250,000, is untenable because it relies exclusively on the void postnuptial property agreement. We therefore hold that the district court abused its discretion in its determinations of the marital residence's value, the setoff owed to Clarence from the marital residence, and its division of the marital debts and assets. The district court's decree is vacated in each of these regards.

We leave the determination of the premarital value of the marital residence, and whether Elizabeth shared Clarence's opinion as to the premarital valuation of the marital residence independent of the property agreement and the weight given to any such opinion, to the district court. Further, we advise the district court to consider the mortgage debt on the marital property in determining the appropriate setoff value.

## CONCLUSION

We find merit in Elizabeth's assignments of error that the trial court improperly relied on the postnuptial agreement to determine the value of the marital residence and to setoff the first $250,000 in equity from the marital residence to Clarence.

The decree of the trial court is reversed to the extent it enforced the postnuptial agreement and otherwise is vacated as to the premarital value of the marital residence, the appropriate setoff for the marital residence, and the related division of marital debts and assets. Accordingly, we remand the cause to the district court with directions to determine the premarital value of the marital residence for setoff to Clarence and divide the marital property independent of the terms of the postnuptial agreement.

Vacated in part, and in part reversed
and remanded with direction.