Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
03/07/2017 09:09 AM CST

Lynne D. Lisec, appellant, v.
James A. Lisec, appellee.
___ N.W.2d ___

Filed March 7, 2017.    No. A-15-634.

1. **Motions to Vacate: Time: Appeal and Error.** The decision to vacate an order any time during the term in which the judgment is rendered is within the discretion of the court; such a decision will be reversed only if it is shown that the district court abused its discretion.
2. **Judgments: Words and Phrases.** An abuse of discretion occurs when the trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.
3. **Divorce: Appeal and Error.** In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge.
4. **Judges: Words and Phrases.** A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.
5. **Courts: Jurisdiction.** In civil cases, a court of general jurisdiction has inherent power to vacate or modify its own judgment at any time during the term in which the court issued it.
6. **Courts: Jurisdiction: Motions to Vacate: Dismissal and Nonsuit.** A court normally has jurisdiction over a motion to vacate an order of dismissal and reinstate a case.
7. **Divorce: Child Custody: Child Support: Property Division: Alimony: Attorney Fees: Appeal and Error.** In actions for dissolution of marriage, an appellate court reviews the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees de novo on the record to determine whether there has been an abuse of discretion.
8. **Divorce: Property Division.** Under Neb. Rev. Stat. § 42-365 (Reissue 2016), the equitable division of property is a three-step process. The

first step is to classify the parties' property as marital or nonmarital. The second step is to value the marital assets and liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365.

9. **Divorce: Attorney Fees: Appeal and Error.** In an action for dissolution of marriage, the award of attorney fees is discretionary with the trial court, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion.

10. **Attorney Fees.** The award of attorney fees depends on multiple factors that include the nature of the case, the services performed and results obtained, the earning capacity of the parties, the length of time required for preparation and presentation of the case, customary charges of the bar, and the general equities of the case.

Appeal from the District Court for Lancaster County: Jodi Nelson, Judge. Affirmed.

Tad D. Eickman for appellant.

Adam R. Little, of Ballew, Covalt & Hazen, P.C., L.L.O., for appellee.

Inbody and Pirtle, Judges, and McCormack, Retired Justice.

Pirtle, Judge.

## INTRODUCTION

Lynne D. Lisec appeals from a decree entered by the district court for Lancaster County dissolving her marriage to James A. Lisec. Lynne takes issue with the court's reinstating the case after it had been dismissed, as well as the court's classification and distribution of various assets, its award of attorney fees to James, and its failure to require James to pay discovery costs. Based on the reasons that follow, we affirm.

## BACKGROUND

Lynne and James were married in May 2006. This was not a first marriage for either party, and no children were born of this marriage, nor were any minor children affected by these

proceedings. In December 2006, the parties executed a post-nuptial agreement, which provided that property each party maintained in his or her own name remained the property of such party and provided that property the parties placed in both of their names as joint tenants became joint marital property.

Lynne filed a complaint for dissolution of marriage on June 6, 2011. James filed an answer on July 6, which sought dissolution of the parties' marriage, division of the parties' assets and debts, and attorney fees and costs.

On September 10, 2012, Lynne filed a voluntary dismissal of her complaint. The trial court ordered the case dismissed on September 13. On that same day, James filed a motion to reinstate the case or to reconsider the dismissal on the ground that his answer included a counterclaim that could not be dismissed by Lynne.

Following a hearing on James' motion, the court found that James' answer included a counterclaim that should not have been dismissed with Lynne's complaint. The court entered an order on September 19, 2012, within the same term, reinstating the case. Specifically, it stated that its prior order of September 13 should be amended "insofar as the dismissal shall only relate to the claims brought by [Lynne]. [James'] claims for dissolution, division of marital assets and debts, attorney fees and costs remain pending."

Trial on James' counterclaim was held on 3 days between September 2014 and March 2015. Both parties, represented by counsel, testified that they believed the postnuptial agreement was a fair and reasonable agreement that was valid and enforceable, and they asked the court to divide the marital estate in accordance with the agreement. We note that the Nebraska Supreme Court recently held in *Devney v. Devney*, 295 Neb. 15, 886 N.W.2d 61 (2016), that historically, postnuptial property settlement agreements were invalid in Nebraska on the ground of public policy, and that Nebraska statutes do not abrogate the public policy against such postnuptial

agreements unless such agreements are concurrent with a separation or divorce. Thus, the *Devney* court found that the parties' postnuptial agreement was void to the extent it settled the parties' property rights. The *Devney* case was released after the court entered its decree in the present case and after Lynne and James filed their briefs on appeal.

In the present case, both parties agree that the postnuptial agreement is fair and reasonable and agree that it should be enforced. Further, by enforcing the agreement, the trial court implicitly found that it was fair and reasonable. As a result, the agreement was ratified at the time of trial and we choose to treat it as a settlement agreement rather than a postnuptial agreement. Accordingly, the agreement will be referred to as such throughout the opinion.

The evidence at trial showed that in 2007, Lynne received monetary gifts in various forms from her mother. The total amount of the gifts was $393,006.66. None of the monetary gifts were given to James, and Lynne maintained all of the gifts in her own name.

In 2009, Lynne and James purchased a house in Hickman, Nebraska, for $220,000. Prior to the closing on the purchase of the house, Lynne cashed two certificates of deposit that had been gifted to her by her mother and deposited the proceeds totaling $40,018.90 into a joint bank account of the parties. The account had been solely Lynne's account prior to the marriage, but James' name had been added to the account after the marriage. A few weeks after depositing the proceeds into the account, Lynne withdrew $47,696.23 from the same account in the form of a cashier's check payable to a title company. The money was used for a downpayment on the house. The house was placed in joint tenancy and both parties were obligated on the deed of trust. The house was sold during the pendency of the divorce proceedings, and the proceeds of the sale totaled $28,678.

Lynne submitted a list of personal property items that she alleged James had in his possession and which she valued at

$10,000. When further questioned about the personal property, Lynne testified that she wanted a money judgment of $10,000 to compensate her for the property. She stated that she was not willing to take all the items back and give James a credit for $10,000.

Lynne also testified that in January 2011, about 5 months before filing for divorce, she withdrew $8,000 from the parties' joint checking account, leaving a balance of $568. Lynne acknowledged that the account was joint and admitted to either still having that money or having spent it. She testified that she withdrew the money because she was concerned about her marriage falling apart and that she was "fleeing" from her home.

James testified that he had several individual retirement accounts that were opened long before the parties married and that he was no longer contributing to them at the time the parties were married. Lynne's name was never put on any of the accounts. In 2011, James used funds from the accounts to create a limited liability company called FUBAR Property Management (FUBAR). James is the sole owner and manager of FUBAR. FUBAR purchased a duplex in Lincoln, Nebraska, with funds from James' accounts. At the time of trial, James was living in one half of the duplex and the other half was a rental unit, managed by FUBAR.

The evidence also showed that prior to the parties' marriage, James owned two vehicles, a 1998 Chevrolet S10 pickup and a 2005 Volkswagen Beetle. After the parties were married, both vehicles were retitled in the name of both parties as joint tenants. The pickup was subsequently sold for $2,500, and the proceeds were being held in a trust account. The parties still owned the Volkswagen.

At the end of trial, the court addressed a motion to allocate discovery costs filed by James, to which Lynne filed an objection, regarding a bill he received from Heige Thanheiser, a private investigator. Lynne had hired Thanheiser to investigate James between 2012 and 2014 concerning a loss of

consortium lawsuit that arose out of a car accident Lynne had in January 2011. However, James believed the investigation was geared toward attacking his credibility and reputation. James issued a subpoena on Thanheiser on February 19, 2014, requesting production of certain documents and surveillance video. Thanheiser refused to comply with the subpoena, and James filed a motion for an order to compel production. The motion was granted, and Thanheiser produced and supplied the information as required to James, as well as separately supplying information to the court. Thanheiser subsequently sent a bill to James for $2,318.85, which he claimed was the reasonable and necessary cost of producing the information.

Thanheiser testified that he never communicated with James' counsel about the charges before producing the requested documents, never discussed charging $75 per hour for 17 hours of work or the costs of video editing or copying costs, and never conditioned the release of the materials on receiving payment. A portion of the expenses were the result of Thanheiser's producing an additional copy of the information for the court, which he was not asked to do.

Following trial, the court entered a decree of dissolution dividing the marital estate, ordering Lynne to pay $8,000 toward James' attorney fees, and denying Lynne's request that James be ordered to pay the fees and costs of Thanheiser.

## ASSIGNMENTS OF ERROR

Lynne assigns that the trial court erred in (1) reinstating the case, or amending the dismissal of the same, as James had failed to file a counterclaim or setoff; (2) failing to award her the full value of the house sale proceeds and failing to consider James' vehicles subject to the parties' settlement agreement; (3) failing to award her the full value of the real estate taxes required to be paid by James; (4) failing to order James to return Lynne's personal property, or the value of the same; (5) awarding James all of the money Lynne had withdrawn from

a joint bank account of the parties 5 months before the action was filed; (6) failing to award Lynne any of the assets of James' limited liability company, (7) ordering Lynne to pay a portion of James' attorney fees; and (8) failing to require James to pay certain discovery costs.

## STANDARD OF REVIEW

[1,2] The decision to vacate an order any time during the term in which the judgment is rendered is within the discretion of the court; such a decision will be reversed only if it is shown that the district court abused its discretion. *Kibler v. Kibler*, 287 Neb. 1027, 845 N.W.2d 585 (2014). An abuse of discretion occurs when the trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

[3,4] In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Coufal v. Coufal*, 291 Neb. 378, 866 N.W.2d 74 (2015). A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

## ANALYSIS

*Reinstating Case.*

Lynne first assigns that the trial court erred in reinstating or amending the dismissal of the case. Lynne had filed a voluntary dismissal of her complaint, and the trial court ordered the case dismissed. Pursuant to Neb. Rev. Stat. § 25-602 (Reissue 2016), a plaintiff can dismiss his or her action when no counterclaim or setoff has been filed by the opposite party. The court subsequently reinstated the case, finding that James' answer contained a counterclaim that should not have been dismissed with Lynne's complaint. Lynne argues that James

did not file a separate counterclaim or setoff and that his answer should not be treated as a counterclaim.

[5,6] Although not argued by Lynne, we first note that the trial court had the authority to reinstate the case with respect to James' counterclaim. In civil cases, a court of general jurisdiction has inherent power to vacate or modify its own judgment at any time during the term in which the court issued it. *Molczyk v. Molczyk*, 285 Neb. 96, 825 N.W.2d 435 (2013). A court normally has jurisdiction over a motion to vacate an order of dismissal and reinstate a case. *Id.* The court's order reinstating the case was within the same term that the case was dismissed.

We now turn to whether the trial court properly found that James' answer included a counterclaim. There is nothing in the Nebraska Court Rules of Pleading in Civil Cases that required James to specifically caption his pleading as a "counterclaim." In fact, there is no actual designation for a "counterclaim"; rather, the appropriate designation is an "answer" within which a party can plead a counterclaim. Neb. Ct. R. Pldg. § 6-1107(a) sets forth the pleadings allowed and states as follows:

> There shall be a complaint and an answer; a reply to a counterclaim denominated as such, *if the answer contains a counterclaim*; an answer to a cross-claim, if the answer contains a cross-claim; a third-party complaint, if a person who was not an original party is summoned as a third-party defendant; and a third-party answer, if a third party complaint is served. *No other pleading shall be allowed*, except that the court may order a reply to an answer or a third-party answer.

(Emphasis supplied.)

Neb. Ct. R. Pldg. § 6-1108 provides the general rules of pleading and states in part:

> **(a) Claims for Relief.** A pleading which sets forth a claim for relief, whether an original claim, counterclaim, cross-claim, or third-party claim, shall contain (1) a caption, (2) a short and plain statement of the claim showing

that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks. . . .

. . . .

**(e) Pleadings to Be Concise and Direct; Consistency.**

(1) Each averment of a pleading shall be simple, concise, and direct. No technical forms of pleadings or motions are required.

Further, Neb. Ct. R. Pldg. § 6-1110(a) provides that every pleading shall contain a caption setting forth the name of the court, the title of the action, the file number, and a designation as in § 6-1107(a).

Finally, Neb. Ct. R. Pldg. § 6-1113(a) provides that "[a] pleading may state as a counterclaim any claim which at the time of serving the pleading, the pleader has against an opposing party."

Most importantly, the character of a pleading is determined by its content, not by its caption. *Kerr v. Board of Regents*, 15 Neb. App. 907, 739 N.W.2d 224 (2007).

James' answer has a caption setting forth the name of the court (the "District Court [for] Lancaster County"), the title of the action ("LYNNE D. LISEC, Plaintiff, vs. JAMES A. LISEC, Defendant"), the file number ("Case No. CI 11-2309"), and a designation as per § 6-1107(a) ("ANSWER"). James' answer, therefore, meets the requirements of a "caption" under the rules. James' answer also contains short and plain statements alleging who the parties are, where they live, when and where they were married, and that the marriage is irretrievably broken. Finally, the answer contains a demand for judgment for the relief sought, namely a dissolution of the parties' marriage, equitable division of the assets and debts, attorney fees and costs, and any further relief as granted by the court.

We conclude that James' answer meets the requirements of a counterclaim as set forth in Nebraska's pleading rules and should not have been dismissed by Lynne's voluntary dismissal of her petition. Thus, the court did not err in vacating the dismissal and reinstating James' counterclaim.

*Division of Property.*

[7] Lynne's second through sixth assignments of error relate to the court's division of property. In actions for dissolution of marriage, an appellate court reviews the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees de novo on the record to determine whether there has been an abuse of discretion. *Coufal v. Coufal*, 291 Neb. 378, 866 N.W.2d 74 (2015).

[8] Under Neb. Rev. Stat. § 42-365 (Reissue 2016), the equitable division of property is a three-step process. The first step is to classify the parties' property as marital or nonmarital. The second step is to value the marital assets and liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. *Pohlmann v. Pohlmann*, 20 Neb. App. 290, 824 N.W.2d 63 (2012).

Lynne first argues that the trial court erred in failing to award her all of the proceeds from the sale of the house and to consider James' vehicles, the pickup and the Volkswagen, to be marital property based on the parties' settlement agreement.

In regard to the sale of the house, Lynne argues that she should have been awarded the entire $28,678 in proceeds because she provided the downpayment for the house from nonmarital funds obtained as a gift from her mother. Lynne cashed two certificates of deposit gifted to her by her mother and deposited that money into the parties' joint bank account. Lynne contends that those same funds were thereafter used to make the downpayment on the house and should retain their identity as gifted funds. Thus, Lynne argues that those funds are nonmarital property and that she should have been awarded all of the proceeds from the sale of the house as nonmarital property to reimburse her for those funds.

Lynne testified that she deposited the funds from the certificates of deposit into a joint bank account and that the downpayment for the purchase of the house came out of that joint bank account. Lynne also testified that the house was

placed in joint tenancy and that both of their names were on the mortgage. The parties' settlement agreement provided that property placed in both parties' names became joint marital property. Therefore, when Lynne deposited the funds from the cashed certificates of deposit into the parties' joint bank account, it became joint property based on the terms of the settlement agreement. Where the money in the account originated from is of no consequence; once the money was placed in a joint bank account, it became marital property subject to division by the court in the divorce proceeding. Thus, the court properly treated the proceeds from the sale of the house as a marital asset in accordance with the parties' settlement agreement.

In regard to the pickup and the Volkswagen, Lynne argues that because the two vehicles were put in joint tenancy after the marriage, she should have received one-half of the total value of the vehicles. The two vehicles together were valued at $11,500, allegedly entitling her to $5,750. The trial court awarded the full amount of the vehicles to James.

However, in its order, the trial court specifically found that the pickup and the Volkswagen were placed in joint tenancy during the marriage. Therefore, the trial court determined that the vehicles were marital property, but simply chose to award the value of the two vehicles to James in distributing the entire marital estate.

Lynne's assignment in regard to the distribution of the proceeds from the sale of the house and the value of the pickup and the Volkswagen is without merit.

Lynne next assigns that the trial court erred in failing to award her the entire amount of real estate taxes that James owed. The trial court found that James owed Lynne for half of the real estate taxes on the Hickman house. Lynne contends that the real estate taxes, "for the entire year, were $2,255.65." Brief for appellant at 10. She states that half of $2,255.65 is $1,127.83, but that the court's "'Balance Sheet,'" wherein it distributed the property, included an amount of "$563.92."

Brief for appellant at 10. Lynne asserts that this amount is incorrect and that "she should be allowed an additional sum of $563.91." *Id.*

In a January 2012 temporary order, the trial court noted that the marital home was listed for sale and ordered that for as long as neither party resided in the home, each of them shall pay 50 percent of all ongoing costs, including real estate taxes. The only evidence of real estate taxes is from 2011. Exhibit 19 contains a receipt for a payment in the amount of $2,255.65 for real estate taxes and interest for the first half of 2011, which does not coincide with Lynne's argument that the taxes for the entire year were $2,255.65.

Further, James was specifically asked who paid the real estate taxes reflected in exhibit 19, and he said they were paid out of a joint checking account, so he and Lynne both paid them. At that point, exhibit 19 was offered into evidence, with no objection by Lynne. Later at trial, James acknowledged that he was required to pay half of the real estate taxes after January 2012 and that he "possibly forgot" or did not remember if he paid his half. There is no evidence as to the amount of real estate taxes for 2012.

We conclude that Lynne's assignment of error regarding real estate taxes is not supported by the record, and we find no merit to her assignment of error.

Lynne also assigns that the trial court erred in failing to order James to return certain personal property or to award her the value of the same. Lynne testified that when she left the marital home, she took little personal property with her. She testified that she wanted either to have certain personal items returned to her or to be awarded the sum of $10,000, her estimate of the value of the items. Upon further questioning, Lynne indicated that she preferred to be compensated for the items, rather than having the items returned to her. That is exactly what the court did. The trial court determined that the items of personal property in James' possession had a value of $8,500, and it attributed that value as an asset awarded to

James in dividing the marital estate. There was no error by the trial court.

Lynne next assigns that the trial court erred in awarding James the $8,500 Lynne had withdrawn from a joint bank account prior to filing for divorce. Lynne contends that "at least one-half of the amount . . . withdrawn should be considered Lynne's funds. Nonetheless, the Court credited to Lynne the entire amount of $8,500 when, at best, that amount should have been only $4,250.00." Brief for appellant at 11.

Lynne admitted to withdrawing $8,000 from the parties' joint bank account in anticipation of her marriage ending. She also admitted to either still having the money or having spent it. The trial court found that Lynne withdrew $8,500 from the parties' joint bank account prior to filing the divorce action and that the money was joint property and should be accounted for in the distribution of marital assets. The court attributed the $8,500 to Lynne as an asset awarded to Lynne in dividing the marital estate. There was no error by the court in doing so.

Lynne's last assignment of error related to the court's distribution of the marital estate is that the court erred in failing to award her any of the assets of FUBAR. As the trial court found, the evidence showed that James used funds from his individual retirement accounts to establish FUBAR, which subsequently purchased a duplex. None of these funds were acquired during the marriage or contributed to during the marriage. They were James' sole property at the time of the marriage and were never put into joint tenancy with Lynne. The trial court found that based on the settlement agreement, none of the funds used to create and capitalize FUBAR were marital property. It further found, therefore, that the property owned by FUBAR is nonmarital and not subject to distribution in the marital estate. Based on the evidence in the record, we agree, and the trial court did not err in failing to award Lynne any of the assets of FUBAR.

*Attorney Fees.*

[9,10] Lynne next assigns that the trial court erred in finding that she should pay a portion of James' attorney fees. The trial court ordered Lynne to pay $8,000 toward James' attorney fees. In an action for dissolution of marriage, the award of attorney fees is discretionary with the trial court, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion. *Gress v. Gress*, 271 Neb. 122, 710 N.W.2d 318 (2006). The award of attorney fees depends on multiple factors that include the nature of the case, the services performed and results obtained, the earning capacity of the parties, the length of time required for preparation and presentation of the case, customary charges of the bar, and the general equities of the case. *Id.*

In determining that Lynne should pay a portion of James' attorney fees, the trial court found that the original complaint for divorce was filed in June 2011 and that Lynne's actions since then had caused prolonged litigation. Lynne's actions, as noted by the court, included her lack of cooperation relating to the sale of the marital home, which resulted in the court's appointing a receiver, and what the appointed receiver characterized as "vindictive behavior" once a prospective buyer was identified; her efforts to dismiss and refile the same case in another jurisdiction and, when unsuccessful, filing an appeal; her hiring of a private investigator; the issuance of subpoenas to numerous witnesses who were never called to testify; and her failing to disclose assets in discovery. Evidence showed that James had incurred over $40,000 in attorney fees, much of which was incurred as a result of Lynne's actions listed above. We conclude that the trial court did not abuse its discretion in ordering Lynne to pay $8,000 toward James' attorney fees. This assignment of error is without merit.

*Discovery Costs.*

Lynne's final assignment of error is that the trial court erred in failing to require James to pay certain discovery

costs, specifically Thanheiser's bill to James for the costs in producing information pursuant to the order to compel production. She contends that it was error to require her to pay Thanheiser's bill when it was James who requested the materials. She makes no further argument, and the only authority referenced in her brief to support her position is a "See" citation to Neb. Ct. R. Disc. § 6-334, which deals with the production of documents by parties. Brief for appellant at 13.

The trial court relied on a different discovery rule, Neb. Ct. R. Disc. § 6-334(A)(c)(1), which provides, in part: "A party or an attorney who obtains discovery pursuant to this rule shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena." The court also noted § 6-334(A)(c)(2)(B), which provides, in part, that when an order of production is issued on a motion to compel, a non-party is to be protected "from significant expense."

There is no evidence of any steps taken by James to avoid imposing undue burden or expense on Thanheiser. However, there was also no evidence presented as to how Thanheiser arrived at the amount he was requesting or to show that the amount was reasonable and necessary to comply with the court's order. The bill from Thanheiser, although in the transcript, was not offered into evidence. There was evidence to indicate that a portion of Thanheiser's expenses in complying with the motion to compel were a result of Thanheiser's making separate copies of everything for the court, which was not requested and was inappropriate. There is no way to tell how much of the bill was attributed to the extra copies produced. Further, Thanheiser testified that he had no discussions or other communication with James' counsel about the costs of producing the information prior to compiling the information, making extra copies, and delivering the information. Based on the evidence before us, we conclude that the trial court did not err in finding that James was not required to pay the bill from Thanheiser for the information produced pursuant to the motion to compel.

## CONCLUSION

We conclude that the court did not err in reinstating the case upon determining that James' answer included a counterclaim. We further conclude that the court equitably divided the marital estate in accordance with the terms of the parties' settlement agreement, and did not err in awarding attorney fees to James or in failing to require James to pay discovery costs. Accordingly, the trial court's decree of dissolution is affirmed.

AFFIRMED.