IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

WITTHUHN V. WITTHUHN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

BILLY D. WITTHUHN, APPELLANT,

V.

NATALIE R. WITTHUHN, APPELLEE.

Filed May 9, 2017.    No. A-16-585.

Appeal from the District Court for Dodge County: PAUL J. VAUGHAN, Judge. Affirmed.

Avis R. Andrews for appellant.

Michael J. Wilson, of Schaefer Shapiro, L.L.P., for appellee.

PIRTLE, BISHOP, and ARTERBURN, Judges.

PIRTLE, Judge.

### INTRODUCTION

Billy D. Witthuhn appeals the decree of dissolution filed by the district court for Dodge County on May 16, 2016. For the reasons that follow, we affirm the decision of the district court.

### BACKGROUND

The parties were married in May 2009 in Fremont, Nebraska. They are the parents of Gavin, born in 2008, and Journey, born in 2010. Billy is also the father of Hailey W., a child born from a previous relationship. Natalie is the mother of two older children, Kaiden J. and Haylee J. The parties separated in March 2014, and Billy filed a complaint for dissolution of marriage on March 24, 2014.

- 1 -

Natalie filed an answer and counter-complaint for dissolution, in which she requested temporary and permanent legal and physical care, custody, and control subject to Billy's reasonable right of visitation.

After a hearing on March 31, 2014, the district court for Dodge County ordered that the parties jointly share in the temporary legal custody of the minor children. Billy was granted temporary physical placement and custody subject to parenting time with Natalie, which included alternating weekends and one overnight every week.

At trial, Billy offered the parties' partially mediated parenting plan which included a proposed week on/week off schedule for parenting time during the summer months. Natalie did not object and the plan was received as exhibit 7. The parties reached no agreement for parenting time during the school year, and made no agreement as to physical custody.

Trial took place on December 11, 2015.

Billy testified that he is employed as a four-wheeler mechanic who earns $14 per hour. He works Monday through Saturday and regularly earns overtime. Billy testified that he and the children had recently moved to a bigger, three-bedroom rental home in North Bend, Nebraska. His girlfriend, Angela moved in with him after approximately one year of dating. Angela and Billy were expecting a child in April 2016. Angela has a 13-year-old son, who resides with his grandmother. The children get along well with him when he visits.

He testified that Gavin is in first grade and Journey is in preschool in North Bend. He said they do very well in school, and he helps with their homework and attends parent-teacher conferences. When Billy is not available, he pays family members to babysit the children. Billy requested that the court continue the temporary order for custody, and adopt the terms of the partially mediated parenting plan.

Billy stated concerns that the children throw temper tantrums before going to Natalie's home and cry when they return from visits. He testified that he observed bruising on the children on a weekly basis after they returned from visits with Natalie. He discussed his concerns with the school and the police department, but he has not discussed his concerns with Natalie. He said that for a few days after returning from visits the children talk back to him and behave stubbornly.

Billy testified that after the parties separated he sent a number of texts to Natalie. In March 2014, he told Natalie that the only way he would let her see the children was if she agreed to spend the night with him and the kids in a hotel room, because he did not want to let them out of his sight. He also told her on "many occasions" that he wanted the children to have nothing to do with her. He sent texts to Natalie including one that stated "Just remember the words conceal and carry . . . hate you with ALL MY HEART:)." He testified that he did not view these texts as threatening. He called Natalie names including "a bitch, a whore, things like that." He said that he regretted sending "just a few" of the texts, and some of the texts were warranted due to her "actions and behavior." He sent a message to Natalie stating he was "glad OUR miscarriage baby didn't get to no what n who you turned into[sic]" and, at trial, he said "I still stand by that" statement. Billy also gave Kaiden's father, Brian, Natalie's contact information and texted Natalie to "have fun" because he knew Brian intended to "fight for custody." Neither party alleges the texts were ever seen by any of the children.

Billy testified that he never personally witnessed Natalie engaging in reckless sexual behavior in the home or around the children, but he communicated his displeasure with her regarding allegations that she had cheated on him. He testified that he is not a racist person, but he used racial slurs in his conversations with her about people who were "tearing [his] family apart." He said he tries not to use racial epithets around his children but he does "once in a while" during a football game or at a race track when he gets excited.

Billy acknowledged that Natalie obtained a harassment protection order against him in November 2014, which had expired by the date of the trial. Billy said he had not communicated with Natalie for approximately 6 to 7 months and when they transport the children for parenting time, he said "we don't look at each other, we don't talk to each other."

Billy has multiple criminal convictions for actions which occurred prior to the children being born. His convictions include: (1) minor in possession and driving with a suspended license in 1997; (2) contributing to the delinquency of a minor in 1998; (3) theft in 1999; (4) driving with a suspended license in 2000; (5) third degree assault in 2002; (6) writing checks for insufficient funds and domestic assault in 2005; (7) driving under the influence.

Billy testified that he had been terminated unsatisfactorily from probation on approximately 6 occasions. Billy testified that when he was charged with assault in 2002 he hit his girlfriend, Katie T., in the face. After he and Katie ended their relationship, Katie was awarded custody of their daughter, Hailey W. He said he was ordered to complete the "men's batterer's program" but chose not to participate, and his probation was revoked. He also admitted to consuming alcohol when the terms of his probation expressly prohibited alcohol consumption. Katie obtained a domestic abuse protection order in May 2002, and it was in effect until August 2002. There was a period of approximately 6 years when he did not have contact with Hailey. Billy was ordered to complete anger management courses on two other occasions and did successfully complete those courses. Hailey lives in North Loup, and he has started to re-establish a relationship with her.

Billy testified that on one occasion in 2012 or 2013, he and Natalie were arguing after she returned home at 4:30 a.m. and Journey woke up. He said he tripped over a doll house, kicked it, and it hit Journey in the eye. He said that the incident was attributed to both he and Natalie because if she "wouldn't have came [sic] home at 4:30 in the morning and drinking, then there wouldn't have been an argument, doll house wouldn't have been kicked, daughter wouldn't have woke up to even be hit with the doll house." Journey had a black eye, and it healed over time.

He testified that he does not drink around the children, or drink until he is drunk; he limits himself to six beers per day. Billy testified that he had spanked the children in the past, but has not hit or spanked them since completing a parenting course through Boys Town. He said since taking the course he has also tried not to say anything offensive or derogatory about or toward Natalie.

In 2014, after the parties separated, Billy was charged with two counts of contributing to the delinquency of a minor. He said he was charged because his niece and nephew were in his home, and they had been drinking. He testified that he did not provide the alcohol or know that they had been drinking, but he entered a guilty plea and paid a fine.

Billy testified that there was some tension between him and Kaiden, and he attributed the tension to Natalie. He testified that he disciplined Kaiden for his behavior and Natalie did not

enforce Billy's disciplinary decisions, and did not discipline Kaiden or set limits for him in any way. He testified that he spanked Kaiden and hit him upside the head "once in a while." Natalie told Billy that he did not treat Kaiden like the other children, but he believed the other children should be treated differently because they did not have the same disciplinary issues that Kaiden did. He testified that he insulted Kaiden's biological father "several times" but said that Natalie did as well.

Natalie testified that she resides in Scribner, Nebraska and is employed by Bright Beginnings Child Enrichment Center. She resides with Kaiden, Haylee and her boyfriend, Lowell, as well as Journey and Gavin when she exercises her parenting time. Natalie testified that she is not in contact with Kaiden's father, and she had previously obtained a protection order against him. She testified that she is involved in a healthy, co-parenting relationship with Haylee's father. Lowell has one child, who resides with his mother in Kentucky.

Natalie testified that problems started to develop between her and Billy after they married. Billy began to drink more frequently, consuming between 6 and 12 beers daily. She also said Billy "started to become violent" toward Kaiden, hitting him in the head and telling him he was a "piece of shit," that Kaiden would turn out to be just like his father, and that he deserved to go to Boys Town. Natalie said she told Billy he should treat the children equally and she asked him to treat Kaiden with more respect. She said Billy reacted by shoving her against a wall. She also testified that when Billy was drinking, he would "force himself" upon her sexually. She said she did not call the police because she was in fear for her safety and the safety of the children.

Natalie testified that the incident with the dollhouse occurred on an evening in January 2013, as the children were getting ready for bed. She testified that Billy was drinking that night and he was frustrated with Gavin and Journey because they were horsing around. Natalie was not in the same room and she heard a big bang, then Journey started screaming. When Natalie entered the room she saw Journey covering her face, the dollhouse had moved, and Billy was standing over it. Natalie took Gavin, Journey, Kaiden, and Haylee J. and went to stay at her grandparents' house for a week. She reported the incident to the sheriff's department, but nothing came of the report. She told Billy that she was willing to give him another chance if he participated in Alcoholics Anonymous and anger management. Billy moved out of the house for a week to get help and when he returned things were good for about a month, until he started drinking again.

Natalie testified that at the time she and Billy married, she was employed by O'Reilly Auto Parts full-time and was paid $8.75 per hour. She worked full time as a paraprofessional at Eagle Elementary School from August 2009 to August 2010, and earned $8.25 per hour. Natalie worked as a waitress at RJ's a bar in North Bend for about six months in 2012. She worked 20 to 25 hours per week and was paid $7.00 per hour plus tips. She worked shifts from 5 or 6 p.m. to 11 p.m. or 12 a.m., while Billy or Billy's sister cared for the children. She said she left RJ's because the job was causing problems in her relationship with Billy.

Natalie was employed by Casey's General Store in North Bend from July or August 2013 to March 2014. She worked 35 hours per week and was paid $8.30 per hour. She transferred to Casey's General Store in West Point when she moved out of the marital home and into new residence in Scribner. She left Casey's when she started her current position at Bright Beginnings Child Enrichment Center in July 2014. She is the lead toddler teacher at the daycare, which is

located next door to her home. Her starting pay was $7.25 per hour, and is now $8.20 per hour. She works 10 a.m. to 6 p.m. Monday through Friday.

Natalie testified that she attempted to go back to school to train for a career in nursing in March 2014. She said she was accepted into the program at Midland University in Fremont and she lined up daycare for the children. She testified that Billy sold her Pontiac minivan to All Metals for $400, so she would not be able to drive to school.

She testified that Billy spent a lot of money on lottery tickets, beer, and football cards. In February 2014, Natalie and Billy received a $6,200 tax return, which was loaded on a card that was kept in Natalie's purse. She testified that Billy got into her wallet and that she saw only $800 of the $6,200, implying that Billy took the rest.

Natalie testified that on the morning of March 14, 2014 she went downstairs in the marital home to find Billy and his parents packing her belongings into boxes. She was told to vacate the home with no advance notice. Natalie said Billy told her to give Gavin and Journey hugs and kisses because they would not be going with her. Natalie stayed with a friend in Scribner as she tried to find a new residence. She said Billy dictated terms and ultimatums for her to abide by if she wanted to see the children. Natalie said Billy reasoned that she should not see the children because she was a cheater and a liar, but she testified that she was "absolutely not" seeing other men at the time she was living with Billy.

Natalie testified that Billy "flipped her off" on occasion, and that there were times when his body language was intimidating toward her. She also testified that Billy called her rude names. Natalie testified that Kaiden and Haylee are doing "100 percent" better since her separation from Billy. Their school attendance and performance improved, and Natalie said Kaiden is a "totally different kid, in a good way."

Natalie testified that the partial parenting plan, mediated shortly after the temporary order in May 2014, provided for week on, week off parenting time. At the time of trial, Natalie testified that she believed that the mediated plan for joint legal and physical custody was no longer in the children's best interests. Natalie stated that she did not believe that she and Billy were capable of successfully co-parenting. She testified that it was in the children's best interests for her to have sole legal and physical custody.

Both parties testified that the children have returned from parenting time with the other parent dirty or bruised. They both described incidents when the children were injured in the other parent's care.

Billy testified that in September 2015 Journey was riding her bike on the sidewalk of his apartment complex and her bike was hit by a car. Journey was knocked from the bike and she had scrapes on her leg from the sidewalk. This incident occurred during his parenting time and he testified that "accidents happen." Billy did not notify Natalie after Journey's accident, Natalie heard about it from Journey and from the accident investigator. He said Gavin got into a "major accident" during Natalie's parenting time, which resulted in him returning to Billy's care with four staples in his forehead. Billy testified that Gavin was injured by the barrel of a gun.

Natalie testified that she and the children were at a gathering at a family member's residence in July 2015, when Gavin was injured. He was six years old at the time. Natalie's grandfather, Dale, was shooting cans on a tree and Gavin was allowed to shoot the gun, with adult

supervision. Natalie testified that she was not in the same area of the property at the time Gavin was injured. She was told, by Dale, that Gavin had pulled the trigger too soon, before Dale was able to stabilize his arms to protect Gavin from the gun's recoil. Natalie took Gavin to urgent care in Fremont where he received four staples. Natalie did not notify Billy immediately after Gavin's accident.

Dale testified that he went with Natalie to explain to Billy what had happened to Gavin. He said Billy "absolutely blew up." Dale said Billy yelled at Natalie, calling her derogatory names and telling her that she would never see the children again.

Jessica Witthuhn, Billy's sister testified that when she saw the family during the marriage, it seemed that Billy interacted more with the children than Natalie. She testified that after Billy was granted temporary custody she saw the children on a daily basis because she provided child care while Billy worked. Billy has asked her to be present at exchanges with Natalie so she can be a witness if "something happens." She testified that after Natalie's parenting time, the children are very "clingy to Bill," and do not like to let him out of their sight. She testified that the children appear to be comfortable in Billy's presence and she has never witnessed Billy physically discipline the children. Jessica said that Billy drinks, but rarely drinks to intoxication, and she has never observed him to be intoxicated in the presence of the children. Her son and daughter were involved in the incident which led to Billy's citation for contributing to the delinquency of a minor. She said she was aware the children were drinking, but they told her that they did not do so in Billy's home.

Billy's girlfriend, Angela Gomez, testified that he is a good dad and the children "absolutely love him." She testified that Billy drank beer, but not to the point of intoxication and he did not drink when the children were present. She said she has not seen him behave violently or aggressively toward the children. She said when he disciplines the children he raises his voice, takes away toys, or sends them to their room. She said he "hardly ever" spanks the children, but "if they don't listen, it comes to a swat on the bottom." Angela testified that Billy's assertion that he quit spanking the children months ago was not true, and that he had swatted them on the bottom recently.

Whitney Ortgies, Natalie's sister, regularly spent time in the Witthuhn's home from 2009 to 2012 or 2013 when they lived in Eagle. She testified that she saw Billy lose his patience with Kaiden and hit him upside the head. She also heard Billy tell Kaiden that "he was stupid like his sperm donor." She saw Billy drink six beers or more on a daily basis, and said he behaved disrespectfully toward Natalie. She also testified that she heard him insult Natalie and use racist slurs in front of the children. She testified that she never witnessed Natalie drinking to excess around the children.

The decree of dissolution was filed on May 16, 2016. The district court found Billy was unfit for sole or joint custody and determined that Natalie should have sole physical and legal custody of Gavin and Journey, subject to Billy's reasonable parenting time.

The district court ordered Billy to have regular parenting time every other weekend from Friday after school to the following Sunday at 6 p.m. during the school year and summer. Billy was ordered to pay child support in the amount of $680 per month, effective June 1, 2016. Billy

was ordered to pay $3,000 for Natalie's attorney to pay for a portion of the fees incurred in this matter.

Billy filed a motion for new trial on May 25, 2016. A telephonic hearing was held on June 8, 2016 and Billy's motion for new trial was overruled. Billy timely appealed.

## ASSIGNMENTS OF ERROR

Billy alleges eight assignments of error, of which he has argued two in his brief. Alleged errors must be specifically assigned and specifically argued in order to be considered by an appellate court. We address only those errors that are assigned and argued. *Schnell v. Schnell*, 12 Neb. App. 321, 673 N.W.2d 578 (2003). Therefore we address whether the district court erred in awarding sole legal and physical custody to Natalie, and in ordering Billy to pay attorney fees in the amount of $3,000 to Natalie's attorney.

## STANDARD OF REVIEW

In actions for dissolution of marriage, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Burcham v. Burcham*, 24 Neb. App. 323, 886 N.W.2d 536 (2016). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, and alimony. *Id.*

In a dissolution of marriage case, an award of attorney fees is discretionary, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion. *Id.*

A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. Devney *v. Devney*, 295 Neb. 15, 886 N.W.2d 61 (2016).

## ANALYSIS

*Custody of Minor Children.*

Billy asserts the best interests of the minor children required the court to award him sole legal and physical custody. He also asserts that, in the event that he is not awarded sole legal and physical custody, the court should have awarded joint legal custody, with physical custody awarded solely to him. We find no abuse of discretion in the district court's custody determination.

When custody of minor children is an issue in a proceeding to dissolve the marriage of the children's parents, custody is determined by parental fitness and the children's best interests. *Burcham v. Burcham, supra.* When both parents are found to be fit, the inquiry for the court is the best interests of the children. *Id.* In this case, the district court found that Natalie demonstrated she was a fit parent, and found that Billy was unfit for sole or joint custody.

The court based its decision upon the evidence that Billy had engaged in substantial criminal behavior, the evidence that Billy had committed acts of domestic violence, and his history of alcohol use or abuse. The court also considered the evidence that Billy has demonstrated his disrespect for court orders through multiple violations of the terms of his probation, and his aggression and unkind words toward Natalie shows that he is incapable of entering into a healthy co-parenting relationship.

The court considered evidence that Billy has a "problem with alcohol," which he does not recognize and refuses to treat. The court stated that Billy would likely continue to drink excessively and engage in violent behavior directed toward those in his household. Despite Billy's assertions that he has changed since his domestic assault conviction, the court found the evidence shows that during the five-year marriage, he has continued to drink heavily and engage in abusive and cruel behavior toward Natalie, the children, and his step-child, Kaiden. The court found the evidence indicated that Billy justified the use of force by indicating that family members shared responsibility for the incidents, because they had upset him. The court observed that Billy copes with anger and bitterness by lashing out at Natalie and harassing her at every opportunity.

The court found these facts make joint legal custody unworkable, and joint physical custody an unhealthy situation for the children to reside in.

The court found Natalie established that she is a good parent and she is a fit and proper person to have custody of the minor children. She has established a new home, the younger children have established good relationships with their older siblings, who have shown improvement in their behavior and school work since the parties' separation. The court found it was in the children's best interests to spend the majority of their time with their older siblings in Natalie's care and custody, and determined that Natalie should have sole legal and physical care, custody, and control of the parties' minor children.

Upon our de novo review, we find the district court did not abuse its discretion in determining that Billy was not a fit or appropriate parent for joint or sole custody.

The best interests of a child require a parenting arrangement "for a child's safety, emotional growth, health, stability, and physical care and regular and continuous school attendance and progress." Neb. Rev. Stat. § 43-2923(1) (Reissue 2016). The best interest of a child also require that:

> [t]he child's families and those serving in parental roles remain appropriately active and involved in parenting with safe, appropriate, continuing quality contact between children and their families when they have shown the ability to act in the best interests of the child and have shared in the responsibilities of raising the child.

§ 43-2923(3). Section 43-2923(6) further provides:

> In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to consideration of the foregoing factors and:
>
> (a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;
>
> (b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based upon sound reasoning;
>
> (c) The general health, welfare, and social behavior of the minor child;
>
> (d) Credible evidence of abuse inflicted on any family or household member[; and]
>
> (e) Credible evidence of child abuse or neglect or domestic partner abuse.

The parties have demonstrated that they are unable to work together for the benefit of the children and mutual decision-making would be difficult. There is less potential for friction between the parties if they are not forced to work together to make decisions on behalf of the minor children, for whom they obviously care a great deal. Both parties are employed and are able to provide a suitable home for the children, and both parties reside with their respective partners.

There is credible evidence that Billy has engaged in domestic partner abuse of a former partner, and Natalie testified that Billy has verbally abused her and put his hands on her in anger. It appears that the children have a loving relationship with both parents, but there is evidence that Billy has engaged in and may still engage in inappropriate physical discipline of the children who are in his care. Billy has not demonstrated the ability to act in the best interests of the children or to peacefully share in the responsibilities of raising the children with Natalie.

On de novo review of a judgement in marriage dissolution proceedings, when the evidence is in conflict, we consider, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Burcham v. Burcham, supra.*

We find the district court did not abuse its discretion in determining that the best interests of the minor children required awarding sole legal and physical custody to Natalie. Therefore, we affirm the decision of the district court.

*Attorney Fees.*

An award of attorney fees is discretionary and will not be disturbed on appeal absent an abuse of discretion. *Burcham v. Burcham, supra.* The award of attorney fees depends on multiple factors that include the nature of the case, the services performed and results obtained, the earning capacity of the parties, the length of time required for preparation and presentation of the case, customary charges of the bar, and the general equities of the case. *Id.* Customarily in dissolution cases, attorney fees and costs are awarded only to prevailing parties or assessed against those who file frivolous suits. *Noonan v. Noonan*, 261 Neb. 552, 624 N.W.2d 314 (2001).

The district court found that an award of attorney fees to Natalie, in the amount of $3,000, would be fair and equitable based on the parties' relative financial situations and Billy had a "substantially greater earning capacity."

The evidence shows that Billy earns more than $14 per hour and regularly earns overtime wages. Natalie works full time and her job history indicates she has earned between $7 and $9 per hour in recent years. She was the prevailing party in this dissolution action, and Natalie's attorney presented an affidavit indicating she was charged attorney fees of $5,505 for services related to this action. Based on this evidence, we cannot say the district court abused its discretion in ordering Billy to pay a portion of Natalie's attorney fees.

## CONCLUSION

Upon our review of the record, we find that the district court did not abuse its discretion in awarding sole legal and physical custody to Natalie, subject to Billy's reasonable parenting time,

and that the district court did not abuse its discretion in ordering Billy to pay a portion of Natalie's attorney fees. Accordingly, we affirm the decree of the district court.

AFFIRMED.