IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

ROSBERG V. ROSBERG

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

KELLY R. ROSBERG, APPELLEE,

V.

PAUL A. ROSBERG, APPELLANT.

Filed April 30, 2019.    No. A-17-909.

Appeal from the District Court for Knox County: PAUL J. VAUGHAN, Judge. Affirmed as modified.

Paul A. Rosberg, pro se.

Kelly R. Rosberg, pro se.

MOORE, Chief Judge, and RIEDMANN and BISHOP, Judges.

BISHOP, Judge.

The marriage of Kelly R. Rosberg and Paul A. Rosberg was dissolved by decree in July 2017. Paul, pro se, appeals from the decree entered by the Knox County District Court. We affirm as modified.

I. BACKGROUND

Kelly and Paul were married in 1996 and had seven children during their marriage, six of whom were still living at the time Kelly filed for divorce in August 2014. Paul also had seven children from a previous marriage, six of whom were still living. Kelly had other children as well, one from a previous relationship and one from a previous marriage.

When Kelly filed for divorce, Paul was incarcerated in federal prison. Kelly asked that sole legal and physical custody of the parties' six children be awarded to her. She also asked for child support, alimony, and attorney fees. A temporary order was entered on November 21, 2014,

- 1 -

granting Kelly temporary physical custody of the children and ordering Paul to pay $3,778 per month in child support. Child support was calculated using an income capacity of $1,256.67 gross per month for Kelly and "[b]ased upon [Kelly's] representations and familiarity with [Paul's] earnings that [Paul] earns approximately $250,000.00 per year." No temporary spousal support was awarded "due to the minimal financial documentation provided to the Court." Kelly was awarded $1,500 in attorney fees. Later, in December 2016, the district court awarded Kelly temporary spousal support of $3,000 per month.

Repeatedly throughout these divorce proceedings, Paul filed motions and requested to have the divorce matter conducted via a trial by jury; all requests were denied. Additionally, Paul repeatedly filed motions asking the trial judges to recuse themselves (because Paul filed various lawsuits naming the judges as defendants). The initial trial judge recused himself in November 2015 and a new judge was appointed. The second trial judge initially recused himself but then rescinded his earlier recusal order and continued to preside over the case. Further motions by Paul for the second trial judge to recuse himself were denied.

Numerous pretrial motions and hearings took place between the time the divorce was filed in August 2014 and the time of trial in May 2017. Although the parties each had counsel off and on since 2014, they were both pro se at the time of trial. The trial took place over the course of 4 days in May 2017. We will discuss the trial evidence relevant to the errors assigned in our analysis below. A decree dissolving the marriage was entered by the district court on July 28. As noted by the district court in its decree,

> The record in this case is voluminous. [Paul] filed over 100 pretrial motions and offered numerous exhibits at every hearing. [Kelly] responded with approximately 30 pretrial motions, mostly in response to [Paul's] motions. Over 130 exhibits were received by the Court <u>before</u> trial in this matter.
>
> [Paul] filed motions to reconsider following the entry of almost every pretrial order. [Paul] filed three appeals in this case before final appealable orders had been entered.
>
> The parties were unable to agree on any issues before trial, so the trial involved the disputed issues of child custody, parenting plan, visitation, child support, property division, alimony and the validly of a prenuptial agreement.

(Emphasis in original.)

In the decree, the district court determined that the parties' prenuptial agreement was invalid and unenforceable because Kelly had not signed it voluntarily. The court dissolved the parties' marriage and divided the marital estate. The court entered judgment against Paul in the amount of $579,935 in favor of Kelly to equalize the marital estate; Paul was to pay the judgment in five equal payments of $115,987, payable on September 1 each year from 2017 to 2021.

The district court awarded legal and physical custody of the parties' minor children to Kelly, subject to Paul's rights of parenting time as set forth in the court-created parenting plan attached to and incorporated into the decree. The parenting plan provided parenting time for Paul every other weekend from 6 p.m. Friday to 6 p.m. Sunday, 2 continuous weeks during the school summer vacation, and it established a holiday parenting time schedule. Paul was ordered to pay Kelly child support in the amount of $2,453 per month for the five children who were still minors commencing August 1, 2017, as well as 78 percent of any noncovered medical expenses and

work-related daycare expenses for the minor children. Paul was also ordered to pay Kelly alimony of $500 per month for 36 months commencing August 1.

Paul filed a motion for reconsideration, and in an order filed on August 11, 2017, the district court made one amendment to the decree, now acknowledging that Paul had completed "Attachment 1" and filed it with the clerk on February 22. However, the court pointed out that Paul failed to provide that document as an exhibit during trial, and therefore the filing was "simply a pleading and not evidence which the court can consider in this matter."

Paul timely appealed.

## II. ASSIGNMENTS OF ERROR

Paul assigns, summarized, reordered, and restated, that the district court erred in (1) denying his request for a trial by jury, (2) denying his motions for the judge to recuse himself, (3) not allowing him the opportunity to fully present his evidence at trial and refusing to allow all issues to be heard, (4) determining that the stipulation agreement entered by the parties in case No. CI 13-57 was not valid and enforceable, (5) determining the prenuptial agreement was not valid and enforceable, (6) awarding legal and physical custody of the children to Kelly, (7) calculating temporary and permanent child support and spousal support, (8) determining the value of the marital assets, (9) ordering him to pay attorney fees, and (10) ordering him to jail without a trial by jury.

We note that Paul argues, but did not assign as error, a number of other issues. However, to be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *Fetherkile v. Fetherkile*, 299 Neb. 76, 907 N.W.2d 275 (2018). See, also, *Friedman v. Friedman*, 290 Neb. 973, 863 N.W.2d 153 (2015) (pro se litigant will receive same consideration as if he or she had been represented by attorney, and, concurrently, litigant is held to same standards as one who is represented by counsel).

## III. STANDARD OF REVIEW

In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion. *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017).

Parenting time determinations are also matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Aguilar v. Schulte*, 22 Neb. App. 80, 848 N.W.2d 644 (2014).

An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Flores v. Flores-Guerrero*, 290 Neb. 248, 859 N.W.2d 578 (2015).

When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Donald v. Donald, supra.*

## IV. ANALYSIS

We note that the record on appeal in this case is voluminous. The transcript was more than 1,300 pages. The bill of exceptions contained more than 1,200 pages of testimony and more than 100 exhibits. The trial at times was difficult to follow as both pro se parties jumped from topic to topic and from exhibit to exhibit, often without a logical flow. We address the relevant evidence from trial in the appropriate sections of the analysis.

### 1. TRIAL BY JURY

Repeatedly throughout these divorce proceedings, Paul filed motions and requested to have the divorce matter conducted via a trial by jury; all requests were denied. Paul relies on Neb. Const. art. V, § 9, which states, "The district courts shall have both chancery and common law jurisdiction, and such other jurisdiction as the Legislature may provide; and the judges thereof may admit persons charged with felony to a plea of guilty and pass such sentence as may be prescribed by law." Black's Law Dictionary 280 (10th ed. 2009) defines "chancery" as, "A court of equity[.]" Paul also cites to Neb. Const. art. I, § 6 ("right of trial by jury shall remain inviolate") and U.S. Const. amend. VII ("[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved"). Paul argues that the Nebraska Constitution specifically states that district courts have common law jurisdiction and that he noticed all parties, the clerk, and the court that he wanted to convene a "common law jury" and that "[t]he case was to be decided in a common law court, **NOT IN AN EQITY OR CHANCERY COURT OR BY A JURY IN EQUITY**." Brief for appellant at 10-11 (emphasis in original).

In *Eihusen v. Eihusen*, 272 Neb. 462, 466-67, 723 N.W.2d 60, 63 (2006), the Nebraska Supreme Court stated:

> Article I, § 6, of the Nebraska Constitution provides that "[t]he right of trial by jury shall remain inviolate . . . ." [Ellipsis in original.] We have explained that the purpose of this constitutional provision is to preserve the right to a jury trial as it existed at common law and under statutes in force when the Nebraska Constitution was adopted in 1875. . . . At common law, legal claims were tried by a jury and equitable claims were tried by a court. . . . Accordingly, we have traditionally denied jury trials in equitable actions and provided jury trials as a matter of right in legal actions.

(Citations omitted.)

And as stated by the district court in the instant case, "Nebraska precedent establishes that marriage dissolution/divorce cases are not rooted in common law and are equitable in nature." See, *Marshall v. Marshall*, 298 Neb. 1, 902 N.W.2d 223 (2017) (in Nebraska, dissolution of marriage cases are equitable in nature); *Else v. Else*, 219 Neb. 878, 367 N.W.2d 701 (1985) (divorce nonexistent at common law). Because dissolution of marriage cases are equitable in nature, parties are not entitled to a trial by jury. Despite his opinion to the contrary, Paul cannot choose to invoke a court's common-law jurisdiction in an equitable action. Accordingly, the district court did not err in denying Paul's request for a trial by jury.

## 2. Motions to Recuse

The initial trial judge recused himself in November 2015. The second trial judge initially recused himself in February 2016, but then in March rescinded his earlier recusal order and continued to preside over the case. Further motions by Paul for the second trial judge to recuse himself were all denied.

A motion requesting a judge to recuse himself or herself on the ground of bias or prejudice is addressed to the discretion of the judge, and an order overruling such a motion will be affirmed on appeal unless the record establishes bias or prejudice as a matter of law. *McCullough v. McCullough*, 299 Neb. 719, 910 N.W.2d 515 (2018).

As stated by the second judge in one of his orders (January 2017), Paul's lawsuits against the judge "have been routinely dismissed and are frivolous in nature," and they are only filed with "the intention of having this judge be disqualified and having the matter continued indefinitely until after another judge can be assigned this case." The judge believed that if he recused himself, Paul would continue "the same antics in order to prevent this matter from becoming finally litigated."

The record reveals that Paul filed a motion to recuse the first trial judge and then repeatedly filed motions to recuse the second trial judge because Paul had filed lawsuits against each of them; Paul also filed a motion to recuse another district court judge. We find the second trial judge reasonably concluded that if he recused himself, that Paul would just continue "the same antics" with another judge. Further, we find nothing in the record to establish bias or prejudice as a matter of law. Therefore, the second trial judge's decision not to recuse himself was not an abuse of discretion.

## 3. Opportunity to Fully Present Evidence and Allow All Issues to be Heard

Paul claims that the district court did not allow him the opportunity to fully present his evidence at trial and refused to allow the issues to be heard, including the "9 Common Law Cases." Brief for appellant at 3.

The district court in this case allowed the parties 4 days for trial. Each party was given 2 days to present his or her case, and such time was to include the opposing party's cross-examination of the witnesses. During Paul's 2 days, he was repeatedly given time reminders by the court and encouraged to hurry along with his case, especially during the many times when Paul was trying to produce irrelevant or hearsay testimony or evidence, or when Paul was being narrative in his questioning of witnesses. Trying to keep the proceedings on track, the court told Paul to "make your determinations as to which of your evidence you believe is most important and present that as soon as you can." The court informed Paul that it had given him an ample opportunity to present evidence and that he needed to plan his presentation of evidence accordingly. Paul was able to call more than 20 witnesses during his case and offered numerous exhibits. A trial judge has broad discretion over the conduct of a trial. *Robison v. Madsen*, 246 Neb. 22, 516 N.W.2d 594 (1994). Based on our review of the record, and under the circumstances of this case, we find that the district court's use of time limits did not unduly limit the parties' presentation of evidence. Each party was given ample time to present his or her case; the effective management of his share of the time allotted was entirely in Paul's control.

We note that in his brief, Paul claims the district court "just took away 1½ hours of his time by telling him they would be done at 3 p.m. on the last day of trial when earlier he said Paul would have until 4:30 p.m." Brief for appellant at 12. Paul's statement is not supported by the record. On the last day of trial, the court told Paul, "You will be done with whatever presentation you have by 3:00 today so that Mrs. Rosberg will have a meaningful opportunity for cross-examination. If she is -- and then she'll have to be done with any cross-examination by 4:30." Accordingly, the court did not "take away 1½ hours" of Paul's time.

As to the "9 Common Law Cases," Paul filed numerous separately docketed actions against Kelly, various judges, attorneys, and/or others while the divorce proceedings were ongoing. See exhibit 214 (which, while initially not received into evidence, was ultimately received into evidence). These other lawsuits related to issues such as: the validity of the parties' prenuptial agreement; Paul's income and the amount of child support to be paid; money Kelly allegedly "stole" from Paul and/or Rosberg Farms; the judges' jurisdiction to enter orders; and the denial of his "right" to a trial by jury. According to Kelly, "all of these court cases, per-se, that have been brought up during this divorce hearing have all been denied previously." And the district court responded, "[B]ecause they were issues that needed to be addressed within the divorce." The "9 Common Law Cases" which were separately docketed, if not otherwise previously dismissed, were not entitled to be heard in their own right in this separately docketed divorce proceeding; however, any relevant issues raised in those separate cases appear to have been addressed within the present case.

Paul also argues, but did not specifically assign, that the court erred in its rulings on various evidentiary issues and motions. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *Fetherkile v. Fetherkile*, 299 Neb. 76, 907 N.W.2d 275 (2018). See, also, *Friedman v. Friedman*, 290 Neb. 973, 863 N.W.2d 153 (2015) (pro se litigant will receive same consideration as if he or she had been represented by attorney, and, concurrently, litigant is held to same standards as one who is represented by counsel).

4. STIPULATION FOR DISMISSAL

Paul argues that the district court erred in finding that the stipulation for dismissal entered into by the parties in case No. CI 13-57 (CI 13-57) was not valid and enforceable; that case was a previous divorce proceeding involving the parties. The parties entered into a "Stipulation for Dismissal of Dissolution Proceeding" in January 2014, in which Kelly and Paul agreed to not "sue each other for any reason including divorce, separation and/or dissolution of their marriage until after June 30, 2015, or that will be a breach of this contract." The stipulation provided that Kelly would make the minor children available to Paul for visitation at the Yankton Federal Prison Camp in Yankton, South Dakota, and Paul would pay Kelly $3,333.33 per month for the benefit of Kelly and the children. Further, Paul would immediately make available up to $30,000 of Kelly's "share of the marital assets to which [Kelly] would be entitled if the parties were to be divorced as of January 14, 2014." The district court approved the stipulation and the case filed at CI 13-57 was dismissed.

In the present divorce proceeding (CI 14-52), the district court entered an order on November 21, 2014, concluding that the stipulation in CI 13-57 was an agreement to have that

dissolution action dismissed, which had been done. In the present matter, the court noted that Kelly was alleging there was no hope for reconciliation, and that the support provided in the stipulation for dismissal was inadequate for the family and she was seeking "appropriate sums" to support herself and the children. The court noted Paul's obligation to provide that support, and concluded that the purported agreement to not sue the other for divorce was against public policy and was unenforceable. We agree with the district court that certain terms within the agreement were not enforceable.

A stipulation voluntarily entered into will be respected and enforced by the courts when such stipulation is not contrary to sound public policy. See *Walters v. Walters*, 12 Neb. App. 340, 673 N.W.2d 585 (2004). Disposition of a question pertaining to a child's best interests is not governed exclusively by a parental stipulation. *Id*. The public policy of this state provides that parents have a duty to support their minor children until they reach majority or are emancipated. *Stacy M. v. Jason M.*, 290 Neb. 141, 858 N.W.2d 852 (2015). It was entirely appropriate for the district court to conclude that the earlier agreement was contrary to public policy regarding Paul's duty to support his children in light of Kelly's allegations that the agreed upon sums were inadequate for that purpose. The agreement to wait until a future date (June 30, 2015) to file for divorce to seek such relief was against public policy related to a parent's duty to support his or her children. We also conclude that an agreement to not file for divorce and setting forth certain property rights as part of the agreement was contrary to public policy. See *Devney v. Devney*, 295 Neb. 15, 886 N.W.2d 61 (2016) (postnuptial property agreements are invalid on grounds of public policy unless such agreements are concurrent with separation or divorce). The postnuptial agreement in CI 13-57 was not made concurrent with a divorce or legal separation; rather, it was made for the purpose of dismissing the former divorce proceeding. We agree with the district court that the parties' agreement as to these specific matters in CI 13-57 were against public policy and were thus unenforceable.

## 5. PRENUPTIAL AGREEMENT

The parties in this case signed a prenuptial agreement on November 9, 1996, which was 4 days before the parties were married on November 13. At trial, Kelly claimed the prenuptial agreement should be declared invalid, while Paul claimed it was valid and should govern the district court's rulings on all contested matters in the divorce. We agree with the district court that it was not enforceable.

### (a) Prenuptial Agreement

The parties' prenuptial agreement was received into evidence at trial. As typical in premarital agreements, it preserved for each party his or her existing liabilities and assets (including increases in value, potential proceeds, and possible inheritances). Less typical, it granted Paul two-thirds and Kelly one-third of the marital estate acquired during the marriage. The 1-page financial statement (handwritten) alleged to correspond with the prenuptial agreement shows that at the time, Paul had a net worth of $647,200. This consisted of $92,700 in real estate, $324,000 in "Feed," $107,500 in "Machinery," $157,000 in livestock, $3,000 in cash, and liabilities of $37,000. No assets were listed for Kelly; rather, the document reflected $10,000 in debt for her.

Notably, the agreement also contained a provision awarding "sole custody" of any children conceived during the marriage to one parent if the other parent was deemed to have abandoned him or her. "[A]buse or mistreatment in any form of the Husband or Wife" would constitute abandonment.

(b) Testimony Regarding Prenuptial Agreement

Kelly (49 years old) and Paul (66 years old) each testified that they met through a personal ad in 1996. The parties' version of events leading to the marriage and the prenuptial agreement differ.

Kelly testified that Paul was looking for someone to come to Nebraska and care for his children. She sold all of her furniture, her car, and most of her things and moved from Tennessee to Nebraska. When Kelly was living in Nebraska with Paul, his mother said it did not look good for them to be living in the same household, even though they were living in separate rooms. So, Paul asked Kelly to marry him. Paul's mom "pressed for us to sign a prenuptial right before we were married." Kelly said she "signed it under duress." Kelly had come to Nebraska with no money and could not leave, "per Paul stating, without leaving in a box." According to Kelly, the parties did not have any legal representation at the time. Kelly "wasn't able to go and have . . . any of the financial information disclosure" looked at because Paul "said we needed to get done and get married because his mom said it looked bad to the public and on the Rosberg name." Kelly testified that the prenuptial agreement was signed approximately 3 days before the parties were married. On cross-examination, Paul asked Kelly if, before she signed the prenuptial agreement, the parties drove to a specific attorney's office and that Paul waited outside while Kelly talked to the attorney and went through the agreement; Kelly said she did "not remember that."

Paul testified that he met Kelly through a personal ad 6 months before they married. He had dated before, but most women were not interested in him after finding out that he had seven children, and he was "tired of being alone." Paul "fell in love" with Kelly's children and he and Kelly decided to get married. Because he had land, as well as children from another marriage, Paul told Kelly they needed a prenuptial agreement; Kelly did not have any money at the time. According to Paul, Kelly was "gung-ho" to have a prenuptial agreement because Kelly was under the impression that she was going to inherit money from her wealthy uncle. Paul's brother had a prenuptial agreement prepared for himself and his wife, and Paul and Kelly used that agreement (like a template) and made the necessary revisions. According to Paul, the parties went to an attorney's office in Stanton, Nebraska, and Kelly talked to the attorney while Paul watched the children. Paul stated that the prenuptial agreement was notarized by "a banker in Bloomfield," Nebraska. The handwritten financial statement was witnessed by Paul's then teenage son Joseph Rosberg and an acquaintance of Paul's. The district court was unsure whether the financial statement was attached to the prenuptial agreement at the time the agreement was signed, or if it was attached after. The court asked Paul, "if [the financial statement] was attached to the [prenuptial] agreement, why didn't you just have the people at the bank witness that at the time the agreement was signed?" Paul responded, "I don't know why." Days after the prenuptial agreement was notarized, the parties were married. Paul testified that there was no pressure on Kelly to get married. "That was her own choice." "No gun was put to her head."

(c) Applicable Law

The enforceability of premarital agreements is governed by Neb. Rev. Stat. § 42-1006 (Reissue 2016), which states, in relevant part:

(1) A premarital agreement is not enforceable if the party against whom enforcement is sought proves that:

(a) That party did not execute the agreement voluntarily; or

(b) The agreement was unconscionable when it was executed and, before execution of the agreement, that party:

(i) Was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;

(ii) Did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and

(iii) Did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.

(2) If a provision of a premarital agreement modifies or eliminates spousal support . . . .

(3) An issue of unconscionability of a premarital agreement shall be decided by the court as a matter of law.

The following factors may be used to determine whether a premarital agreement was entered into voluntarily: (1) coercion that may arise from the proximity of execution of the agreement to the wedding, or from surprise in the presentation of the agreement; (2) the presence or absence of independent counsel or of an opportunity to consult independent counsel; (3) inequality of bargaining power--in some cases indicated by the relative age and sophistication of the parties; (4) whether there was full disclosure of assets; and (5) the parties' understanding of the rights being waived under the agreement or at least their awareness of the intent of the agreement. See *Mamot v. Mamot*, 283 Neb. 659, 813 N.W.2d 440 (2012).

The party opposing enforcement of the premarital agreement has the burden to prove that the premarital agreement is not enforceable. See *id*. With regard to such evidence, an appellate court reviews the record de novo on the record, meaning it reappraises the evidence as presented by the record and reaches its own independent conclusions with respect to the matter at issue. See *id*.

(d) District Court's Ruling

The district court went through a lengthy analysis regarding the factors noted above in light of the evidence presented at trial. The court found that Kelly's testimony was more convincing than Paul's in regard to the execution of the prenuptial agreement. Additionally, the court found Paul's testimony about the agreement being reviewed by an attorney to be "highly suspect" because the court believed that "any attorney, who reviewed this prenuptial agreement, would have advised the parties that the provision in regard to the custody of the minor children was contrary to Nebraska law." The court found Kelly's testimony "compelling" with regard to the short period of time between signing the agreement and the marriage, her isolation in a small town with no opportunity to find independent counsel to review the document, and "the parties certainly had a

- 9 -

disparity of income at the time of the execution of the document." Accordingly, the court found Kelly met her burden to show that the premarital agreement was not signed voluntarily.

When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017). We keep this in mind as we consider the evidence on this issue.

Kelly came to Nebraska with no money and 2 children, she was 17 years younger than Paul, and she was told by Paul she could not leave "'without leaving in a box'"; this certainly indicates an inequality of bargaining power and coercion. See *Mamot v. Mamot, supra* (disparity in parties' income and their respective assets is indication of inequality of bargaining power). She was "pressed" into signing a prenuptial agreement 4 days before the parties married; it is reasonable to conclude the proximity of the execution of the document was also coercive. She did not have an opportunity to get the financial disclosure information looked at or an opportunity to speak with an attorney; there was disagreement on this point, and therefore we must defer to the trial judge's assessment of each party's credibility on this issue. Kelly claimed she did not understand the document. See *Mamot v. Mamot, supra* (premarital agreement is complex legal document which uses specialized terminology that might not be easily comprehended by person unfamiliar with law). Based on our de novo review of the record, we agree with the district court that Kelly met her burden of proof in establishing that she did not sign the prenuptial agreement voluntarily. The agreement was therefore invalid and unenforceable.

### (e) Custody Provision

Although we have already concluded that the prenuptial agreement was unenforceable, for the sake of completeness, we briefly address Paul's argument that Kelly abandoned him when she took the children to Tennessee and filed for divorce and therefore he is entitled to custody of the children pursuant to the prenuptial agreement. A premarital agreement seeking to control custody or support of minor children would not be enforceable in Nebraska. Neb. Rev. Stat. § 42-1004(1) (Reissue 2016) provides a list of matters for which the parties may contract through a premarital agreement; significantly, child custody is not listed, and § 42-1004(2) also provides that the right of a child to support may not be adversely affected by the agreement. When determining child custody, the paramount consideration is the best interest and welfare of the children. See *Bauer v. Bauer*, 184 Neb. 777, 172 N.W.2d 231 (1969). And disposition of a question pertaining to a child's best interests is not governed exclusively by a parental stipulation. See *Walters v. Walters*, 12 Neb. App. 340, 673 N.W.2d 585 (2004). Accordingly, even if we had concluded the premarital agreement was otherwise enforceable, the specific provisions regarding custody of the parties' children would have been found invalid and unenforceable. See *Edwards v. Edwards*, 16 Neb. App. 297, 744 N.W.2d 243 (2008) (part of premarital agreement can be found unconscionable and unenforceable).

### 6. CUSTODY

### (a) Evidence at Trial

Kelly testified that Paul always worked and she took care of the household, and she was the one who took care of the children for the last 20 years. Kelly said that Paul did not spend time

with the children, did not play with them, and did not take an interest in them because he was farming; "He's a workaholic." She claimed Paul had not gone to any of the children's school functions "except a few graduations." When Kelly managed the parties' meat locker plant for 4 years, she took the non-school aged children with her.

Kelly has had "possession" of the children since 2013 when she and Paul were under investigation for a federal offense related to their meat locker plant. Kelly apparently received probation for a misdemeanor and Paul was ultimately sentenced to 18 months in federal prison after he pled guilty to a felony (it appears he served his time in 2014 and 2015). The parties' oldest son, Elias (19 at the time of trial) chose to live on the farm with Kelly's oldest son (from a previous relationship) while Paul was in federal prison, and then Elias lived with Paul after Paul was released.

Kelly believed she was the best person to take care of the parties' children. Kelly did not feel that Paul was "capable" of taking care of the children for long periods of time. "[W]hen the children were [at Paul's], they were constantly interrogated about my financial situation, my boyfriend's situation. They never spent time with the dad as visitation." Kelly obtained a harassment protection order (beginning November 3, 2015) against Paul for herself and their five youngest children, which prohibited Paul from contacting them. On December 16, 2016, the district court ordered supervised visitation for Paul with the minor children in part due to Kelly's allegations of verbal abuse towards her and the children; visitation was to be for 4 hours every other Saturday beginning December 17. Kelly testified that Paul made no effort to see the children with supervised visitation, and asked that the court continue supervised visitation for 1 year so the children can "get to know [Paul] in that supervised visitation setting." She also asked the court to grant her and her family "an order of harassment for no frivolous lawsuits," because "I am being sued continuously, my parents are being sued, and previous boyfriends or other people that I'm working with have been threatened that they were going to be sued for doing business with me, including my realtor."

Kelly testified that Paul never physically hit her, but that he had threatened to. "You [Paul] told me if I left you and divorced you I would leave in a box"; this was said "[o]ver and over during our marriage." When Paul asked her if he ever did anything to hurt any of the children, Kelly responded, "[Y]ou do not physically hurt the children. Your morals and values and your controlling behavior make the children scared of you. They do not want to be around you. I do not want to be around you, but you continue to harass me over and over with lawsuits, [and] letters." "My children can't even sleep. I can't either[,] they're scared of what you're going to do to them."

Paul testified that after his first wife died, he raised his seven children from that marriage by himself until he met Kelly; Kelly had two children of her own at that time. Paul stated:

> [A]ll six of my children, living children, including [Kelly's two older children] have been a success in life. And I believe it's because I made them mine. I disciplined those children. They're all Christian people, and never once have any of those children ever been into trouble with the law.

Paul was "a very strict parent." His children "couldn't date until they were 18; and if it was before the age of 18, they had to have their brother or sister with them. He "taught them how to work" and paid them for the work they did, other than for their chores; they could spend half and were

required to save the other half. Paul encouraged his children to get an education and "they all went to college" (presumably all of the children who were old enough to go to college). "None of [his children] have been divorced." "I know how to raise [children] because I've done it."

Paul stated, "I want custody of my kids because I know exactly what's happening to them." Kelly "lets them do whatever they want. They run the streets" and "they're getting in all kinds of trouble." "They may end up living their life in prison, not because of my will . . . it's because -- because I wasn't able to discipline them." Paul testified that he "stopped at the house in Creighton [where Kelly lived] several times" to see when Kelly came home and "[s]he never came home at night to take care of the children." Paul also felt that Kelly was an "unfit parent because she has mental issues." Kelly testified she had seen a counselor for depression over the divorce and her financial situation, as well as after the parties' young child died years ago. Paul claims he did not exercise his supervised visitation because Kelly threatened to kill the children if he did (she denied this in her testimony). Paul also testified that Kelly was unfit because of her morals in that she had a child out of wedlock prior the parties' marriage (Paul acknowledged being aware of that when he married Kelly) and she also had a relationship with a registered sex offender after the parties' separation. Regarding the sex offender, Kelly testified that her ex-boyfriend got into trouble when he was a teenager because he was dating a 15-year-old girl when he was 17 years old, and when he turned 18 the girl's mother had him arrested for statutory rape. According to Kelly, her ex-boyfriend, whom she had not seen in 1½ years, was now 40 years old and was never alone with parties' children.

Kelly completed the required parenting class, but Paul did not. During trial, the district court told Paul he was supposed to take the class. Paul responded, "I should be the teacher" because "I raised my [first] children, none of them ended up in jail," "[t]hey all turned out to be successful individuals, all Christian people and I've raised children." He said he disciplines the children but Kelly does not and that was why two of the parties' children have been "in all kinds of trouble with the law"; "truth be known . . . I could give more successful parenting classes than what the teacher did obviously." Paul ultimately stated he would take the class.

Four of the parties' children testified at trial. Leah Rosberg (17 years old) testified that she graduated in December 2016. "I graduated early at the top of my class, in the top 10 percent out of 300 students," "I was ranked 14th out of my class." She works as a certified nursing assistant at an assisted living facility and is saving money for college. She testified she wrote an "affidavit" (exhibit 178, pages 13-16; received into evidence over Paul's objections of incorrect facts and no personal knowledge). In that document, which was really a letter to the judge, Leah stated the following. Kelly should get custody of the children because she "has been taking care all [sic] of us for a while now," "[s]he didn't have a job and didn't have any money but she still provided everything we needed." Paul did not pay his child support, and when he did it would be late and for the "incomplete amount." Paul has made life hard for Kelly and the children, he has harassed Kelly and has "tried to and threatened to sue anyone" who helps Kelly with the divorce case. Paul "has scared my family" and it "makes us feel like someone's watching and like we always have to be on the lookout." Her younger sister is scared of Paul coming and taking her away, and her younger brother had night terrors because of the stress of the divorce. Kelly worked hard to keep us safe and provides us with everything we need. We are all "great students" and Kelly has taught us to work hard in school and at home. Kelly spends one-on-one time with the children and

"actually pays attention to their needs." "Even when we were living with my parents together, [Kelly] would be the only one that did anything to care for us." Paul is "ill tempered and impatient." "When I lived with my dad and the kids would come to visit him, he would make me do everything to take care of them," "I had to act like their mom." Based on her testimony, Leah lived with Paul for a while at some point (the timing is unclear) because she was angry at Kelly for grounding her. According to Leah, Paul's house is not a "suitable environment" for the children, there "are mice and mold and trash piled against the wall." When Leah was called as a witness by Paul, she was asked if it was true that she wanted to help Kelly get custody of the children. Leah responded, "The only reason I want my mom to have custody of my siblings is because I know she can take the best care of them." Kelly is home "all the time," "[t]he only thing she goes [to is] work"; "She doesn't work right now but the only places she's been [was] to work." When asked by Kelly if she considered Paul controlling, Leah responded, "Yes."

Lily Rosberg (13 years old) testified that Paul's house has "a mice problem and it's not very clean." Lily could not remember the last time Paul went to one of her school functions.

Samuel Rosberg (16 years old) testified he finished a required anger management class after a disciplinary problem in school. Samuel gets good grades in school (report card from 2015-16 first semester all B+ or better). When asked by Kelly if he thought Paul was controlling, Samuel responded, "Yes." When asked if Paul was verbally or mentally abusive, Samuel responded, "[i]n a way."

Elias Rosberg (19 years old) is the parties' oldest child. He testified that he has been living on the farm with Paul since Paul got out of jail. Elias also works on the farm and has shares in Rosberg Farms' corporation. In his "affidavits" received into evidence, Elias generally stated that he wanted Paul to have custody of the children.

Paul called several of his adult children from his first marriage to testify. They all agreed that their father had taken care of them after their mother died. Some agreed that their father was controlling and that they currently did not have a close relationship with Paul. One of Paul's daughter's testified that Paul has trouble getting along with his siblings and his children. And another daughter testified that Paul could get along with someone if he wanted to get along with them. Some testified about Paul's discipline of them when they were younger, e.g. being grounded for 3 months for swearing or having to write certain statements hundreds of times. All of Paul's older children believed that Paul should get custody of the parties' minor children. One stated that Kelly can be difficult to get along with.

Paul called several other witnesses (people he rented land from and former employees). They generally stated that Paul was truthful, trustworthy, and treated his children well. Some stated that Paul was a better parent than Kelly.

(b) District Court's Ruling

In the decree, the district court found that neither party established that the other party was "unfit" for parenting. The court found that it was "very clear" that Kelly had been the children's primary caregiver during the marriage and that the "children appear to be doing adequately well in light of the circumstances involving ongoing disputes of their parents." The court also found

> [Kelly's] testimony regarding abuse by [Paul] to be highly credible. She indicated that [Paul] was intimidating to her, overbearing and controlling. The Court finds [Paul's]

- 13 -

demeanor during these proceedings to satisfy the Court that [Kelly's] description of [Paul] was accurate and that her testimony in regard to the abuse inflicted upon her during the marriage to be credible.

The court awarded Kelly full legal and physical custody of the parties' minor children. The court did not find Paul "unfit to the degree that would require supervision of his time with his children." And as previously stated in this opinion, the court provided regular and holiday parenting time for Paul in the parenting plan.

### (c) Applicable Law

Keeping the evidence and the court's findings in mind, we now consider the legal principles governing custody and parenting time matters.

When deciding custody issues, the court's paramount concern is the child's best interests. *Citta v. Facka*, 19 Neb. App. 736, 812 N.W.2d 917 (2012). Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) states, in pertinent part:

In determining custody and parenting arrangements, the court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of the foregoing factors and:

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member . . . ; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

### (d) Did District Court Abuse Its Discretion?

In light of the evidence presented, and giving deference, as we must, to the district court who heard and observed the witnesses, we find the district court did not abuse its discretion in awarding legal and physical custody of the minor children to Kelly. When there is evidence favoring and disfavoring both parties, we defer to the trial court, and we see no reason to do otherwise in this case.

7. CHILD SUPPORT AND SPOUSAL SUPPORT

(a) Evidence at Trial

Kelly was a stay-at-home mother during the marriage, although she did manage the parties' meat locker plant for 4 years. During their separation, Kelly worked at a casino (2015 W-2 shows wages, tips, and other compensation of $1,069.68), a fashion store (quit in July 2016 after 2 months because of the distance from the children, and threats by Paul that he would take the children; 2016 W-2 shows wages, tips, and other compensation of $6,929.65), and a family restaurant (2016 W-2 shows wages, tips, and other compensation of $7,214.90).

Upon inquiry from the district court, Paul stated he thought there were 10,000 shares of Rosberg Farms corporation stock. Paul could not state how many shares he owned. Exhibit 197 shows that that there were 10,000 shares in Rosberg Farms, Inc., at the time of the articles of incorporation in December 1994. In February 2014, Paul gifted 1,000 shares total (500 shares each) to two of his sons (Peter Rosberg and Joseph Rosberg) from his first marriage. In December 2016 and January 2017, Paul gifted a total of 8,400 shares to numerous persons. Kelly asked Paul if he wrote his child support checks to her from the Rosberg Farms account as "custom work," and Paul responded, "I have to. . . . [I]t's part of the work you take care of the kids." Paul stated, "I sign the checks and they're on the Rosberg Farms account for a reason. It's because I can't have any money in my account. It's the only avenue I have to get money through the corporation to pay the child support." "I didn't have any choice. Either go to jail or convince the stockholders that that was an avenue that I could use to pay [child support]." The stockholders included Paul, his children from his first marriage, and other relatives.

Ray West testified as a witness for Paul, indicating that he loaned Paul $50,000 in November 2014 and loaned $25,000 to Rosberg Farms in February 2016; West has not received any money from Paul or Rosberg Farms. West was also aware of a note for $10,500 owed by Rosberg Farms used to buy wheat straw in September 2015; also not yet paid.

Peter Rosberg, Paul's son from his first marriage, was given 500 shares of Rosberg Farms by Paul in February 2014, for taking care of the farming operation while Paul was incarcerated in federal prison. Peter acknowledged that he was aware that Paul was having trouble making his child support payments. Paul asked Peter, "At times I called you up and I begged you for money so I could pay the child support through Rosberg Farms?"; Peter responded, "Yes." Peter testified that in February 2017, he wrote a check to Rosberg farms for $4,000, and in March he wrote one check for $20,000 and two checks for $15,000 each (these were loans). On cross-examination, Peter acknowledged that Paul told him the money was going to child support; Peter also testified the money was also "to keep Rosberg Farms in business per operating." Peter acknowledged that since the parties had been legally separated in the beginning of 2014, he had received checks from Rosberg Farms for farming or custom work; Peter said, "My definition for custom work [is] that I do a service for plowing, discing, whatever, for the other party." Peter was not currently farming for Paul or Rosberg Farms. Peter acknowledged receiving 300 shares of Rosberg Farms in January 2017 (4 months before the parties' divorce trial); 300 shares were also given to Peter's son and a nephew.

Joseph Rosberg, also Paul's son from his first marriage, was given power of attorney for Paul when Paul went to federal prison, and took care of Paul's business. He also loaned Paul

$44,000 in November 2016 ($19,000 for a bank loan, $15,000 for child support, and $10,000 to an attorney who defended Paul in a criminal case). On cross-examination, Joseph acknowledged that when he had power of attorney for Paul, he was in charge of multiple accounts and wrote checks for Paul and Rosberg Farms from those accounts. He also acknowledged receiving income for working for Paul and Rosberg Farms since 2013. Joseph acknowledged receiving 500 shares in Rosberg Farms from Paul in February 2014, and then another 300 shares in January 2017. Additionally, Joseph acknowledged that money from personal funds from Paul were transferred into the farm account. Joseph agreed that he would consider Paul able-bodied to farm, and that Paul had not been farming with Joseph since Paul got out of jail.

According to Leah Rosberg's affidavit, Paul had "millions of dollars hidden in assets and among his family and friends." On cross-examination, Paul asked Leah how she knew he had millions of dollars and was hiding it. Leah responded, "From . . . being around you." "When you talked to other people, it's not hard to tell what you're doing." Leah said she overheard the conversations. "I've heard it that you have been giving money to people to hold onto for certain amounts of time."

Additional testimony and evidence appears below when we set forth in detail the district court's findings and ruling.

(b) District Court's Findings and Ruling

The district court stated that determining child support was "extremely difficult" in this case due to Paul's complicated financial deals and his business interests. The court noted Kelly's presentation of bank records demonstrating over $6.7 million deposited into various accounts by Paul from 2011 to 2016. The court also referenced tax returns from 2001 through 2015 provided by Kelly, and noted that Paul provided a personal tax return for 2016 but did not have tax returns for Rosberg Farms. The court found that Paul's adjusted gross income during the marriage "was a high of $16,000 in 2010, to several years showing zero[.]" And although Kelly testified about expenses being run through the farm corporation and the court found her testimony credible, Kelly had not provided the court with any specific amounts which the court could use to "reconstruct what the actual income was for the parties." The court was leery of relying on the tax returns because of the limited income reported "over this 20-year marriage," despite Paul being engaged in farming his entire adult life and other business ventures such as the meat locker plant. Noting exhibit 133 (financial statement for the court prepared by Kelly), the court pondered the discrepancy in the bank deposits of more than $6,748,000 between 2011 and 2016 while Paul's tax records show "little or no income during this entire period of time."

The district court stated that when income tax information is not available or credible, it can consider the parties' earning capacities to determine child support. In doing that, the court found that the evidence showed Paul was able to support himself, his wife, and his 15 children during the time of the marriage. A review of the expenditures in the Rosberg Farms' account showed "numerous items being paid for by the corporation that were of questionable nature." The court referred to a home in Creighton, Nebraska, being purchased by the corporation for $10,000. Kelly and the children lived in this home after the parties separated. The court also referred to $30,000 in repair money given to Kelly from the corporation for that home, as well as the $3,300 per month in support paid by the farm corporation account during the time Paul was incarcerated.

The court further noted that during Paul's incarceration, he showed an adjusted gross income well under the amounts he expended to support his family during that same time. "The family has been able to adequately support the children during the marriage in spite of showing adjusted gross income that would put the family well below the poverty line." It is evident that the district court had difficulty reconciling what was being reported on the tax returns and what was being spent to support the family.

The district noted that the financial statements for the parties in exhibit 134 (filed with the Farmers & Merchants State Bank in the names of the parties and Rosberg Farms from 2001 to 2011), show a total net worth of $619,542 in 2001 and increasing every year until 2011 when the total net worth was listed as $1,431,856). The 2011 statement "was the last financial statement [Kelly] was able to provide the Court." She testified that was because they did not take out another bank loan after that year.

Although the district court was mindful of Paul's testimony that much of the equipment had been further depreciated, it nevertheless still appeared to the court that Paul "has assets of over a million dollars available to him for support of his family." Although noting that "much of the assets that [Paul] has are related to farmland that he inherited from his family," "these assets are capable of producing income to support the parties' minor children."

Although Paul filed Appendix No. 1, a "Property and Liability Statement" with the district court on February 22, 2017, he did not offer that document as an exhibit at trial. Therefore, the filing was "simply a pleading and not evidence which the [district] court [could] consider." Paul also did not submit complete copies of his tax returns. The court found this "should not work to [Paul's] advantage in the Court's determination on child support and property division."

The district court pointed out that in 2013 Paul (or the corporation) paid Kelly $3,333 per month while he was imprisoned for 18 months, bought a home for $10,000, and provided Kelly with $30,000 for home repairs. However, Paul only reported income of $18,000 in 2013 and $563 in 2014. Paul "clearly has the ability to make substantial payments despite reporting little to no income[.]" The district court was "highly suspect" of Paul's claim that he was only able to afford the temporary child support by borrowing money from his son and friend, amounting to loans of over $100,000 in the 2 years the action was pending. The court concluded that Paul "has a substantial earning capacity through his lifetime of farming and livestock operations."

For child support purposes, the district court determined Kelly's income to be $10 per hour for 40 hours per week. Paul's income "was set at $10,000 per month" "based on historical analysis of [Paul's] ability to support his large family and his net worth of over 1 million dollars and the large sums of money that has historically been deposited into [his] various bank accounts." The court ordered Paul to pay child support in the amount of $2,453 per month when there are five children subject to the order, and reducing accordingly based on the number of children remaining as minors. Paul was ordered to pay 78 percent of any medical expenses for the minor children that were not covered by insurance (after Kelly paid the first $480 per year), and 78 percent of any work-related daycare expenses.

As for alimony, the district court noted it had awarded temporary alimony in the amount of $3,000 per month based upon evidence presented by Kelly; Paul failed to appear at that hearing. The court found "the amount of temporary alimony is not supported by the evidence at trial" noting that Paul was 66 years old and semi-retired. Kelly was 49 years old "and has demonstrated that

she is capable of obtaining employment of approximately anywhere from $10 to $12 an hour." Considering the "relative financial circumstances of the parties, along with the child support and property division awarded, the Court believe[d] that [Kelly] [was] entitled to some alimony to assist in her education and training to become more employable." In an affidavit, Kelly stated that she started nursing classes in January 2017. Paul was ordered to pay Kelly alimony of $500 per month for 36 months.

### (c) Did District Court Abuse Its Discretion?

#### (i) Child Support

The Supreme Court has stated:

> In general, child support payments should be set according to the Nebraska Child Support Guidelines. The guidelines provide that "[i]f applicable, earning capacity may be considered in lieu of a parent's actual, present income and may include factors such as work history, education, occupational skills, and job opportunities. Earning capacity is not limited to wage-earning capacity, but includes moneys available from all sources." Use of earning capacity to calculate child support is useful "when it appears that the parent is capable of earning more income than is presently being earned."

*Freeman v. Groskopf*, 286 Neb. 713, 720, 838 N.W.2d 300, 307 (2013). See, also, Neb. Ct. R. § 4-204 (rev. 2015).

Based upon our review of the record and keeping the applicable legal principles in mind, we cannot say the district court abused its discretion when it determined Paul's income "was set at $10,000 per month" "based on historical analysis of [Paul's] ability to support his large family and his net worth of over 1 million dollars and the large sums of money that has historically been deposited into [his] various bank accounts." Further, as to any claim that his temporary child support was set too high, such amounts cannot be modified. See *Berg v. Berg*, 238 Neb. 527, 471 N.W.2d 435 (1991) (child support payments are vested right of payee as they accrue; court may not forgive or modify past-due child support, but may modify amount of child support becoming due in future).

#### (ii) Spousal Support

In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. *Wiedel v. Wiedel*, 300 Neb. 13, 911 N.W.2d 582 (2018). In addition, a court should consider the income and earning capacity of each party and the general equities of the situation. *Id*. See, also, *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017) (alimony reviewed de novo for abuse of discretion).

Again, based upon our review of the record, we cannot say the district court abused its discretion in awarding Kelly alimony of $500 per month for 36 months.

## 8. VALUE OF MARITAL ASSETS

Paul contends that there are no marital assets and therefore the court-ordered settlement should be "nothing." Brief for appellant at 7. Later in his brief, he suggests that we could extrapolate from a 2011 financial statement that the values indicated therein would be lower at the time of trial. He claims that not counting debt, he had $160,000 in personal property in 2017, and that the district court was "totally unfair" in ordering him to pay $580,000 in favor of Kelly for a marital estate when "there wasn't any." *Id.* at 49.

### (a) Evidence at Trial

Kelly produced her "appendix No. 1 Property and Liability Statement" (exhibit 133). The attachment titled "Farmers & Merchants State Bank FINANCIAL STATEMENT" shows that Paul and Kelly and Rosberg Farms, Inc., had a "[n]et [w]orth" of $1,431,856 as of April 25, 2011; the financial statement was signed by both parties. Kelly testified that the 2011 statement is the last one she had from the bank because Paul had not taken out any recent loans.

When discussing her appendix No. 1, Kelly testified that the parties (under Rosberg Farms) have two houses in Creighton and three properties in Randolph (the locker plant, the building next to it, and the next building over). The house Paul lives in is on 80 acres and is in his older children's names, plus the names of the parties' two oldest children; she claimed the parties had a life estate to live there. Deeds in evidence show that only Paul has a life estate in that property.

Exhibit 197 shows that at a "director's meeting" in February 2014, Paul "moved and seconded to grant Joseph Rosberg 500 shares and Peter Rosberg 500 shares of Rosberg Farms Inc., stock for helping and taking care of the farming operation while [Paul] is being incarcerated in the Yankton Federal Prison Camp." Kelly testified that this was after she had originally filed for divorce (that case was dismissed) and an agreement was signed in January 2014. The parties were legally separated and going to get a divorce when the director's meeting took place in February. Kelly said that she was a signer on the Rosberg Farm account for years, but was taken off the account when she filed for divorce.

And as set forth previously in this opinion, Leah testified that Paul was hiding millions of dollars in assets. Additional evidence will be included in the district court's findings below.

### (b) District Court's Findings and Ruling

The district court noted that Paul failed to submit a comprehensive financial statement and that Kelly's property statement was "inadequate in several regards." She failed to adequately identify parcels of real estate and their values; additionally, several properties were owned by Rosberg Farms and not the parties. The court determined that Kelly had no claim to a life estate inherited by Paul. The court further found that, although Kelly stated she was entitled to $3,374,275 as her one-half of deposits into Paul's various accounts during the last 6 years of marriage, that "[t]he statements on those accounts reflect that there is nowhere near the amount of money she is requesting remaining in those accounts at the time of the divorce proceedings." The court valued "the Creighton house and Randolph buildings" to be "less than $30,000."

The district court stated:

> If the Court utilized the Farmers & Merchant State Bank financial statement from 2011 (Exhibit 134, page 22), and subtracts the value of the real estate that belongs to [Paul]

pursuant to inheritance, $199,981, the net marital estate in 2011 was about $1,231,870. This is the last year that the Court had for any value of the marital estate." . . .

[Paul] listed his net value on the premarital agreement (Exhibit 207, page 7) at $647,200 in November 1996. This amount includes $92,700 in real estate. His non-real estate holdings at the time of the marriage he valued at $554,500. Fifteen years later his non-real estate values were $1,231.70 [sic], from the 2011 financial statement. Since this is the only reliable value of the marital estate provided by either party, the Court will utilize this figure as the net marital estate.

The court also took note of the parties' practice throughout the marriage to use the corporation to pay for family expenses. With regard to Paul's claims that Kelly used corporate funds for inappropriate purposes, the court found that the only complaint of substance was a transfer of $36,000 by Kelly from the Rosberg Farm account; the court granted an offset of that amount as noted below. The court's calculation was as follows:

Net Marital Estate $1,231,870
$$\div\, 2$$
$$= 615,935$$
$$- 36,000$$
$$= \$579,935$$

The court stated, "The parties were married 20 years. [Kelly] gave birth to seven children with [Paul]. She worked at home on the farm and at the parties['] business of [the meat locker plant]. She is entitled to an equitable portion of the marital estate." The court also pointed out that Paul had transferred real estate and stock ownership in Rosberg Farms to his children during the divorce, and that Paul never gifted any stock to Kelly during their 20-year marriage. Therefore, in order to "equalize the position of the parties," Paul was ordered to pay $579,935 to Kelly as her share of the marital estate.

### (c) Did District Court Abuse Its Discretion?

From our de novo review of the record, it is clear that the parties' lives were financed by Rosberg Farms, Inc., and because of that, Paul could take a minimal personal income as reflected on tax returns received into evidence. We also agree with the district court that Paul transferred assets during the divorce. Neither party provided a clear picture of their financial situation--Kelly because she did not have access to all of the information, and Paul because he did not provide such during the presentation of his case and was less than forthcoming during his testimony. Under the circumstances, the district court did the best it could with the evidence presented by these pro se parties.

While we agree with the district court's approach to determining a value for the marital estate, we do note an error in its calculations. After finding that the 2011 financial statement showed a net marital estate of about $1,231,870 (after deducting nonmarital real estate values), the court also noted that the financial document prepared at the time of the premarital agreement in November 1996 showed Paul's non-real estate holdings valued at $554,500. And even though the prenuptial agreement was determined to be unenforceable, the "Financial Statement" prepared at

that time has relevance in determining the value of Paul's premarital assets. Although pointing out that premarital value, the court's calculation fails to credit Paul with the value of those non-real-estate assets at the time of marriage. If premarital property can be identified, it is typically set off to the spouse who brought the property into the marriage. *Charron v. Charron*, 16 Neb. App. 724, 751 N.W.2d 645 (2008). The types of assets noted in the 1996 financial statement and those noted in the 2011 financial statement have similarities. We conclude the premarital property was sufficiently identified in the 1996 financial statement.

By setting off the value of Paul's premarital property (excluding real estate, which was already excluded from the net marital estate), we set forth the modified calculation below:

Net Marital Estate $1,231,870
− 554,500 (premarital)
= 677,370
÷ 2
= 338,685
− 36,000 (offset)
= $302,685

Therefore, the marital estate equalization amount is modified from $579,935 to $302,685; the payment plan is therefore also adjusted accordingly with Paul paying the judgment in five equal payments of $60,537, payable on September 1 each year from 2017 to 2021.

## 9. ATTORNEY FEES

Paul contends that the district court erred in ordering him to pay attorney fees to Kelly. Because the district court did not order attorney fees to be paid in the decree, Paul must be referring to the $1,500 the court ordered in November 2014 for the hearing on Kelly's motion for "Temporary Orders," and the $10,000 the court ordered in January 2016 with respect to Kelly's motion for temporary allowances, both at times when she was represented by counsel. We find no abuse of discretion in the district court's orders.

## 10. JAIL WITHOUT JURY TRIAL

Paul assigns that the district court erred when it ordered him to jail without a trial by jury. However, in his brief, Paul does not reference a specific order wherein the court "ordered [him] to jail." And as stated previously in this opinion, to be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *Fetherkile v. Fetherkile*, 299 Neb. 76, 907 N.W.2d 275 (2018). And in any event, we are unaware of any legal authority allowing for a trial by jury in a civil contempt action.

## V. CONCLUSION

For the reasons set forth above, we affirm the district court's decree as modified.

AFFIRMED AS MODIFIED.

- 21 -